UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 17-1630 (JGB) (SPx)** | Date | September 14, 2023 |
|---|---|---|---|
| Title | ***Jeffrey N. Young v. City of Menifee, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) GRANTING County Defendants' Motion for Summary Judgment (Dkt. No. 103); (2) GRANTING-IN-PART and DENYING-IN-PART City Defendants' Motion for Summary Judgment (Dkt. No. 107); and (3) VACATING the September 18, 2023 Hearing (IN CHAMBERS)**

Before the Court are two matters: (1) a motion for summary judgment filed by Defendants County of Riverside ("the County"), Thomas Johnson ("Officer Johnson"), Brian Remington ("Deputy Remington"), and Nina Zalunardo ("Officer Zalunardo") (collectively, "County Defendants") ("County MSJ," Dkt. No. 103); and (2) a partial motion for summary judgment filed by Defendants City of Menifee ("the City") and Scott Stoll ("Officer Stoll") (collectively, "City Defendants") ("City MSJ," Dkt. No. 107) (collectively, "the Motions"). The Court finds the matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of, and in opposition to, the Motions, the Court **GRANTS** the County MSJ and **GRANTS-IN-PART** and **DENIES-IN-PART** the City MSJ. The September 18, 2023 hearing on the Motions is **VACATED**.

## I.   BACKGROUND

On August 11, 2017, Plaintiff Jeffrey N. Young ("Plaintiff" or "Mr. Young") filed a complaint against the City, the County, Riverside County Sheriff's Department, Officer Stoll, Douglas Todd ("Officer Todd"), Nicole Roderos ("Officer Roderos"), Deputy Remington, and Does 1 through 10. ("Complaint," Dkt. No. 1.) On September 5, 2017, pursuant to a stipulation by the parties, the Court stayed this matter pending the outcome of state criminal proceedings against Plaintiff. (Dkt. Nos. 10, 12.) The Court lifted the stay on February 11, 2019. (Dkt. No

24.)  Shortly thereafter, the City, the County, Deputy Remington, Officer Roderos, and Officer Todd separately moved to dismiss the Complaint.  (See Dkt. Nos. 25, 28.)  On April 5, 2019, the Court granted-in-part the motions.  ("Complaint Order," Dkt. No. 42.)

Plaintiff filed a first amended complaint on May 6, 2019.  ("FAC," Dkt. No. 43.)  Defendants moved to dismiss the FAC (Dkt. Nos. 45, 46), and the Court granted-in-part the motions to dismiss.  ("FAC Order," Dkt. No. 56.)

On August 12, 2019, Plaintiff filed a second amended complaint.  ("SAC," Dkt. No. 57.)  The SAC alleged ten causes of action: (1) violation of 42 U.S.C. § 1983 (excessive force) against Officer Stoll and the City; (2) violation of 42 U.S.C. § 1983 (false arrest and imprisonment) against Deputy Remington; (3) violation of 42 U.S.C. § 1983 (denial of medical care) against Officer Stoll, Deputy Remington, Officer Todd, Officer Roderos, and possibly also the City and the County; (4) violation of 42 U.S.C. § 1985(3) against Officer Stoll; (5) assault against Officer Stoll; (6) battery against Officer Stoll; (7) false arrest and false imprisonment against all Defendants; (8) intentional infliction of emotional distress against all Defendants; (9) negligence against all Defendants; and (10) violation of Cal. Civ. Code § 52.1 ("Bane Act") against Officer Stoll, the City, and the County.  (Id.)

On August 21, 2019, the County filed a motion to dismiss the SAC.  ("County MTD SAC," Dkt. No. 58.)  The same day, Deputy Remington, Officer Roderos, and Officer Todd filed an answer to the SAC.  (Dkt. No. 59.)  On August 22, 2023, the parties filed a stipulation to dismiss Plaintiff's fourth cause of action against Officer Stoll with prejudice, which the Court approved the next day.  (Dkt. Nos. 60, 62.)  On August 26, 2019, the City filed a motion to dismiss the SAC.  ("City MTD SAC," Dkt. No. 61.)  On September 6, 2019, Officer Stoll filed an answer to the SAC.  (Dkt. No. 67.)  On September 20, 2019, the Court granted the County MTD SAC and the City MTD SAC.  ("SAC Order," Dkt. No. 69.)  The Court dismissed Plaintiff's first cause of action against the City and his third cause of action against the City and the County without leave to amend.  (Id.)  Thereafter, the County, Deputy Remington, Officer Roderos, Officer Todd, and the City filed answers to the SAC.  (Dkt. Nos. 70, 71.)

On November 17, 2019, the Court issued its Civil Trial Scheduling Order.  ("Scheduling Order," Dkt. No. 77.)  Pursuant to stipulation of the parties, the Court modified that scheduling order on a number of occasions.  (Dkt. Nos. 81-83, 91, 93, 94-95, 98-99, 108-109, 119-120, 124-125.)

On July 2, 2020, the parties filed a stipulation for leave to amend the SAC to substitute a party.  (Dkt. No. 84.)  On July 6, 2020, the Court approved the stipulation.  (Dkt. No. 87.)  On July 2, 2020, the parties filed a stipulation to dismiss Officer Todd and Officer Roderos.  (Dkt. No. 85.)  On July 6, 2020, the Court approved the stipulation.  (Dkt. No. 86.)

---

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk NP

On July 9, 2020, Plaintiff filed a third amended complaint against the City, the County, Officer Stoll, Officer Johnson, Officer Zalunardo,[1] Deputy Remington, and Does 1 through 10. ("TAC," Dkt. No. 88.)  The TAC alleges ten causes of action: (1) violation of 42 U.S.C. § 1983 (excessive force) against Officer Stoll and the City;[2] (2) violation of 42 U.S.C. § 1983 (false arrest and imprisonment) against Deputy Remington; (3) violation of 42 U.S.C. § 1983 (denial of medical care) against Officer Stoll, Deputy Remington, Officer Johnson, and Officer Zalunardo; (4) violation of 42 U.S.C. § 1985(3) against Officer Stoll;[3] (5) assault against Officer Stoll; (6) battery against Officer Stoll; (7) false arrest and false imprisonment against all Defendants; (8) intentional infliction of emotional distress against all Defendants; (9) negligence against all Defendants; and (10) violation of Cal. Civ. Code § 52.1 ("Bane Act") against Officer Stoll, the City, and the County.  (Id.)

On July 13, 2020, Officer Johnson and Officer Zalunardo filed an answer to the TAC. (Dkt. No. 89.)

On January 4, 2022, County Defendants filed the County MSJ. (County MSJ.)  The same day, in support of the County MSJ, County Defendants filed a separate statement of undisputed material facts.  ("County SUF," Dkt. No. 104.)  County Defendants also filed a proposed statement of uncontested facts and conclusions of law and a proposed judgment.  (Dkt. No. 105.)  The same day, County Defendants also filed a compendium of declarations and exhibits in support of the County MSJ.  ("County Compendium," Dkt. No. 106.)

On January 10, 2022, City Defendants filed the City MSJ. (City MSJ.)  The same day, in support of the City MSJ, City Defendants filed a separate statement of undisputed material facts and conclusions of law.  ("City SUF," Dkt. No. 107-1.)  City Defendants also filed a declaration of James Jardin ("Jardin Declaration," Dkt. No. 107-2) and supporting exhibits, a declaration of Craig Carlson ("Carlson Declaration," Dkt. No. 107-3), a notice of lodging of non-paper exhibits (Dkt. No. 107-4), and a request for judicial notice ("RJN," Dkt. No. 107-5.)

---

[1] Although Plaintiff meant to substitute Officer Johnson for Officer Todd and Officer Zalunardo for Officer Roderos, he failed to amend the caption page of the TAC, which still bears the names of the former Defendants.  The Court construes this as a typographical error.  Officer Todd and Officer Roderos are no longer parties to this lawsuit.

[2] The Court dismissed the City from the SAC's first cause of action (excessive force) WITHOUT LEAVE TO AMEND.  (SAC Order.)  Inexplicably, Plaintiff has named the City again as a defendant in his first cause of action in the TAC.  The City remains DISMISSED from the first cause of action in the TAC, notwithstanding this error in the pleadings.  Plaintiff is admonished for his pattern of negligent filings in this case.

[3] On August 22, 2023, the parties filed a stipulation to dismiss Plaintiff's fourth cause of action against Officer Stoll pursuant to Section 1985(3) with prejudice, which the Court approved the next day.  (Dkt. Nos. 60, 62.)  Again, inexplicably, Plaintiff brought back this claim in the TAC, which the Court construes as another error by Plaintiff's Counsel.  The fourth cause of action alleging a violation of 42 U.S.C. § 1985(3) against Officer Stoll remains DISMISSED.

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk NP

On June 26, 2022, County Defendants filed a notice of supplemental authority in support of the County MSJ.  ("County Supplemental," Dkt. No. 118.)

On February 24, 2023, Plaintiff filed an opposition to the County MSJ.  ("Opposition to County MSJ," Dkt. No. 126.)[4]  The same day, in support of the Opposition to County MSJ, Plaintiff filed a declaration of Jeffrey N. Young ("Young Declaration," Dkt. No. 127) and a declaration of Daniel M. Josephson ("Josephson Declaration," Dkt. No. 128).  The same day, Plaintiff filed a statement of genuine disputes of material fact and additional material facts (Dkt. No. 129), but Plaintiff filed a notice of errata correcting that filing and a revised statement of genuine disputes of material fact and additional material in support of the Opposition to County MSJ on February 25, 2023.  ("County MSJ GDMF," Dkt. No. 133.)  On February 24, 2023, Plaintiff filed evidentiary objections to the evidence filed in support of the County MSJ.  ("Evidentiary Objections to County MSJ," Dkt. No. 130.)  The same day, Plaintiff filed various exhibits in support of the Opposition to County MSJ.  ("Opposition to County MSJ Exhibits," Dkt. No. 131.)  Plaintiff also filed notices regarding exhibits that could not e-filed or that were manually filed.  (Dkt. Nos. 132, 134.)

On March 3, 2023, County Defendants filed a reply in support of the County MSJ.  ("County Reply," Dkt. No. 135.)  The same day, County Defendants filed a response to the County MSJ GDMF.  ("Response to County MSJ GDMF," Dkt. No. 136.)  County Defendants also filed a response to Plaintiff's additional material facts.  ("Response to Additional Material Facts," Dkt. No. 137.)  County Defendants also filed evidentiary objections to Plaintiff's evidence filed in support of the Opposition to County MSJ.  ("Evidentiary Objections to Opposition to County MSJ," Dkt. No. 138.)  County Defendants also replied to the Evidentiary Objections to County MSJ.  ("County Objections Reply," Dkt. No. 139.)

On March 3, 2023, the parties filed a joint stipulation to dismiss Officer Zalunardo from the case with prejudice.  (Dkt. No. 140.)  On March 10, 2023, the Court approved the stipulation.  (Dkt. No. 141.)[5]

---

[4] One of the contentions Plaintiff raised in the Opposition to County MSJ was that Plaintiff needed further evidence from a deposition of Officer Stoll, and that a ruling on the County MSJ should be deferred.  (See Opposition to County MSJ at 8.)  As noted below, the Court thereafter granted Plaintiff's request for additional time, allowing him to depose Officer Stoll.  The Court then continued the hearing on the Motions for multiple months, allowing Plaintiff to supplement the record.  As such, the Court essentially granted Plaintiff the relief he sought, albeit through later orders.  To the extent Plaintiff still claims that a continuance is necessary to secure additional evidence, the Court does not find any basis to further delay a ruling on the Motions: Plaintiff has been afforded ample time to conduct discovery.

[5] Because Officer Zalunardo has already been dismissed from the action with prejudice, the Court disregards the arguments in the County MSJ for her dismissal.

Pursuant to stipulation of the parties, the Court continued the hearing on the Motions from February 7, 2022, to August 8, 2022. (Dkt. Nos. 110-111.) Following other stipulations to revise the Scheduling Order referenced above, the hearing set for the Motions was set to June 26, 2023. (Dkt. No. 142.) On June 1, 2023, Plaintiff filed an ex parte application to continue the hearing on the City MSJ from June 26, 2023, to August 28, 2023. ("Application," Dkt. No. 149.) On June 2, 2023, the Court granted the Application and continued the hearing on the Motions to August 28, 2023. ("Order Granting Application," Dkt. No. 152.)

On August 7, 2023, Plaintiff filed an opposition to the City MSJ. ("Opposition to City MSJ," Dkt. No. 161.) In support of the Opposition to City MSJ, Plaintiff filed a separate statement of genuine disputes of material fact ("City MSJ GDMF," Dkt. No. 161-2), evidentiary objections to the evidence filed in support of the City MSJ ("Evidentiary Objections to City MSJ," Dkt. No. 161-3), a declaration of Daniel Josephson ("Josephson Declaration," Dkt. No. 161-1), a compendium of exhibits ("Opposition to City MSJ Compendium," Dkt. No. 161-4), and various exhibits (see Dkt. Nos. 161-5-21.) Also on August 7, 2023, Plaintiff filed a notice of manual filing. (Dkt. No. 162.)

On August 14, 2023, the City filed a reply in support of the City MSJ. ("City Reply," Dkt. No. 163.) In support of the City Reply, the City filed a response to the City MSJ GDMF ("Response to City MSJ GDMF," Dkt. No. 163-1), and evidentiary objections to the evidence filed in support of the Opposition to City MSJ. ("City Evidentiary Objections," Dkt. No. 163-2.)

The same day, Officer Stoll filed a reply in support of the City MSJ. ("Stoll Reply," Dkt. No. 164.) In support of the Stoll Reply, Officer Stoll filed evidentiary objections to the evidence filed in support of the Opposition to City MSJ. ("Stoll Evidentiary Objections," Dkt. No. 164-1.)

On August 17, 2023, the Court ordered Plaintiff to file the entire transcripts of his deposition, the deposition of Officer Stoll, and the deposition of Deputy Remington, as supplemental exhibits. (Dkt. No. 165.) On August 18, 2023, Plaintiff filed these depositions transcripts as supplemental exhibits. (Dkt. No. 166.) On August 21, 2023, Plaintiff filed a notice of manual filing. (Dkt. No. 167.)

The final pretrial conference is currently set for October 23, 2023, and a jury trial for November 7, 2023. (Dkt. No. 125.)

## II.    FACTS

### A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. P. 56(e). At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. See Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he nonmoving

party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment."); <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court considers the parties' objections only where necessary; all other objections are OVERRULED AS MOOT.

"[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here. <u>Burch v. Regents of Univ. of California</u>, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted"). The Court denies some of the parties' objections as "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." <u>Doe v. Starbucks, Inc.</u>, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009); <u>Amaretto Ranch Breedables v. Ozimals Inc.</u>, 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development"); <u>Communities Actively Living Indep. & Free v. City of Los Angeles</u>, 2011 WL 4595993, at *8 (C.D. Cal. Feb. 10, 2011) (summarily overruling boilerplate evidentiary objections when the grounds for the objections were unduly vague and overbroad). The Court overrules virtually all of the parties' personal knowledge, speculation and foundation objections; unless otherwise noted, the evidence relied upon in the order below has a sufficient basis in personal knowledge and foundation to be considered, while the declarant is not engaging in pure speculation.

Most of the parties' hearsay objections are likewise OVERRULED. Evidence which may contain hearsay is admissible for summary judgment purposes if it can be presented in admissible form at trial. <u>See</u> <u>Fonseca v. Sysco Food Servs. of Arizona, Inc.</u>, 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." <u>Calmat Co. v. U.S. Dep't of Labor</u>, 364 F.3d 1117, 1124 (9th Cir. 2004). Moreover, to the extent hearsay statements are the basis for an officer's probable cause determination, that is allowed. <u>See</u> <u>Hart v. Parks</u>, 450 F.3d 1059, 1066 (9th Cir. 2006) ("Police may rely on hearsay and other evidence that would not be admissible in a court to determine probable cause: '[P]robable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.'") (citation omitted); <u>cf.</u> <u>United States v. Castillo</u>, 866 F.2d 1071, 1077 (9th Cir. 1988) ("A magistrate may consider hearsay statements in an affidavit in determining whether there is probable cause to believe that a person is guilty of a crime."). While the Court has a difficult time discerning the basis for some of the parties' hearsay objections, in the Court's view, the evidence objected to is either not hearsay or an exception to the hearsay rule applies to it, such as a statement of a party-opponent or the business or public records exception. <u>See</u> Fed. R. Evid. 801(d)(2); 803(6); 803(8); 803(14); 803(15); in the alternative, the evidence could be admissible under the residual hearsay exception. <u>See</u> Fed. R. Evid. 807.

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk <u>NP</u>

The parties' Rule 403 objections are all OVERRULED because the Court is quite capable of considering only the admissible portions of proffered evidence and disregarding vague, confusing, argumentative, and cumulative pieces of evidence. Likewise, "compound" is not a useful objection at the summary judgment stage: to be sure, some of the cited material facts could have been offered as two or more separate facts, but that has no substantive effect on the Court's determination. See Montoya v. Orange Cnty. Sheriff's Dep't, 987 F. Supp. 2d 981, 994 (C.D. Cal. 2013) (Bernal, J.) (explaining that a court need not exclude evidence at the summary judgment stage on grounds of unfair prejudice, confusion of the issues or other Rule 403 objections and that such objections are properly raised before trial); Holt v. Noble House Hotels & Resort, Ltd, 370 F. Supp. 3d 1158, 1164 (S.D. Cal. 2019) ("Moreover, Federal Rule of Evidence 403 objections are unnecessary at the summary judgment stage because there is no jury that can be misled and no danger of confusing the issues.").

The parties' improper opinion testimony or "requires expert analysis" objections are OVERRULED because they are baseless or irrelevant. The Court disregards anything that is actually in the "form of an opinion" and is not the proper subject of lay opinion testimony. See Fed. R. Evid. 701. Virtually all of the evidence objected to is not an actual "opinion," at least in the form considered by the Court; rather, it relates a factual assertion. To the extent any of this evidence can be construed as an opinion, it is based on a witness's perception, not based on scientific, technical or other specialized knowledge, and is helpful to the trier of fact. See id. For the limited evidence that regards Plaintiff's medical records, the Court finds it very likely that a medical professional, e.g., his treating physician or Dr. Vilke, would qualify as an expert to render expert testimony regarding diagnoses. See Fed. R. Evid. 703. Since no motion to strike expert testimony is before the Court, the Court finds such evidence admissible at this stage.

The Court SUSTAINS County Defendants' outside the pleadings objections to Plaintiff's contentions regarding the failure of Deputy Remington to remove his handcuffs while in the back of a patrol vehicle or at the Sheriff's station. Plaintiff has made no claim regarding excessive force against the County in the TAC; the excessive force claims are solely brought against the City and Officer Stoll. (See TAC.) Plaintiff has not moved to amend the pleadings to provide Deputy Remington or the County with fair notice that he seeks to bring a claim against them based in whole or in part on the force caused by handcuffing. The Court does not consider such evidence. As noted below, other contentions Plaintiff raises now are also far afield from the allegations and theories asserted in the TAC, which the Court disregards.

## R. Request for Judicial Notice

City Defendants request judicial notice of the following documents:

- Declaration of Brian Remington filed by the County on January 4, 2022 (see Dkt. No. 106);
- Declaration of Dr. Gary Vilke filed by the County on January 4, 2022 (see Dkt. No. 106); and

- The California Association of Code Enforcement Officers ("CACEO")[6] Administrative Regulations, obtained from CACEO's website.

(See RJN.) Plaintiff has not opposed the RJN.

The Court may take judicial notice of matters that are either (1) generally known within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The portion of the RJN that asks the Court to take judicial notice of two declarations that are already on the Court's docket in this matter (see Dkt. No. 106) is confusing because the Court need not take judicial notice of its own docket; City Defendants can simply cite to those declarations and the Court will reference them in this order without resort to judicial notice. The RJN is DENIED as to the Declaration of Brian Remington and Declaration of Dr. Gary Vilke because it unnecessary. Courts may take judicial notice of the public records of a legislative, administrative, or quasi-adjudicatory body, including regulations issued by administrative bodies. See Interstate Nat. Gas Co. v. S. Cal. Gas Co., 209 F.2d 380, 385 (9th Cir. 1953); Mack v. S. Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir. 1986), abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104 (1991); Papasan v. Allain, 478 U.S. 265, 269 n.1 (1986); Torrance Redevelopment Agency v. Solvent Coating Co., 763 F. Supp. 1060, 1066 (C.D. Cal.), on reconsideration, 781 F. Supp. 650 (C.D. Cal. 1991); Johnson v. DBTA, LLC, 424 F. Supp. 3d 657, 662 (N.D. Cal. 2019); see also Brown v. Valoff, 422 F.3d 926, 931 (9th Cir. 2005). Plaintiff does not dispute the authenticity of the documents or oppose the RJN in any way. The Court GRANTS the RJN as to the CACEO Administrative Regulations.

## C. Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for present purposes. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### 1. Incident; Arrest and Prosecution of Plaintiff

On October 7, 2016, City of Menifee Senior Code Enforcement Officer Scott Stoll responded to 30140 Golden J. Lane in the City of Menifee in response to a citizen's complaint. (City SUF ¶ 1.) Officer Stoll was instructed to visit Plaintiff's property to investigate an alleged light violation. (City MSJ GDMF ¶ 123.) Officer Stoll arrived at the property to evaluate the brightness of a light for purposes of issuing a citation. (Id. ¶ 126.) Officer Stoll parked his official city vehicle on the dirt-gravel road in front of Plaintiff's house, just past the entrance of Plaintiff's driveway. (City SUF ¶ 2.)

---

[6] According to City Defendants, CACEO is the primary code enforcement education and training entity in California and is the sole entity authorized to certify code enforcement officers in California. See Cal. Health & Safety Code §§ 26206, et seq.

Plaintiff received a phone call from his daughter, Madison, who told him there were law enforcement vehicles with their lights turned on in front of Plaintiff's home. (Id. ¶ 3.) Plaintiff drove home. As he arrived at his home, his vehicle collided with Officer Stoll's vehicle. (See id. ¶¶ 8-9.) Plaintiff got out of his vehicle and began walking towards the entrance of his residence, carrying fast food that he had acquired for his daughter. (Id. ¶ 19.) Officer Stoll was standing in front of his vehicle speaking on his phone when the collision occurred. (City MSJ GDMF ¶ 46.) Seconds after striking Officer Stoll's vehicle, Plaintiff reversed his vehicle away from Officer Stoll's vehicle. (City SUF ¶ 13.) Plaintiff then exited his vehicle and walked to the front of his vehicle to inspect the rear of Officer Stoll's vehicle. (Id. ¶ 14.) Plaintiff also observed Officer Stoll standing in front of Officer Stoll's vehicle. (Id. ¶ 15.) Mr. Young did not immediately walk over to the front of Officer Stoll's vehicle where Officer Stoll was standing. (Id. ¶ 16.) Plaintiff then returned to his vehicle to retrieve fast food. (Id. ¶ 17.) As Plaintiff was retrieving the fast food from his vehicle, Officer Stoll began walking from the front driver's side of his vehicle toward Plaintiff's vehicle. (Id. ¶ 18.) Plaintiff asserts that, before walking towards the entrance of his residence, he waited for Officer Stoll, who was talking on the phone. Seeing that Officer Stoll was on the phone, he began walking toward his neighbor, Linda Lewis, to give her the food. He informed Ms. Lewis that he would open the gate for her to pull her vehicle in and that he had food in his car for his daughter, Madison. (City MSJ GDMF ¶ 47.)[7] Officer Stoll was still speaking on the phone when Plaintiff returned to his vehicle to retrieve the In-N-Out for his daughter. (Id. ¶ 48.) After retrieving the food, Plaintiff took four or five steps before Officer Stoll yelled at him to "Drop it. Drop it." He did not make it inside the gate to his property. (See City MSJ GDMF ¶¶ 19, 49, 73.) Plaintiff told Officer Stoll that the food he was holding was for his handicapped daughter and that he would put it on the hood of his vehicle. (Id. ¶ 50.) Plaintiff complied with Officer Stoll's command to "drop" the food. (Id. ¶ 75.) As Plaintiff turned to put the In-N-Out food on the hood of his vehicle, Officer Stoll grabbed Plaintiff's right arm. (Id. ¶¶ 51, 76.) When Officer Stoll grabbed Plaintiff's right arm, Plaintiff asked, "What are you doing? I'm handicapped." (Id. ¶ 77.) Other than telling Plaintiff to "drop it," Officer Stoll did not say anything to Plaintiff before grabbing his right arm and hitting Plaintiff in the back of his head. (Id. ¶ 78.) While the parties dispute what transpired next, it is undisputed that Officer Stoll physically prevented Plaintiff from entering his property, and almost immediately, the two became engaged in a physical altercation, in which Officer Stoll hit Plaintiff and pepper sprayed him. (It is disputed whether Plaintiff hit Officer Stoll first.) (See City MSJ GDMF ¶ 20.) Officer Stoll requested that Deputy Brian Remington respond to Plaintiff's residence. (City SUF ¶ 20.) Officer Stoll physically detained Plaintiff before he could enter his property, which Officer Stoll believed was necessary to prevent Mr. Young from leaving the scene of a collision. (Id. ¶ 21.) The altercation was essentially over by 10:10:18 a.m., by which time Plaintiff was on the ground with Officer Stoll standing over him with his boot on his chest. (Id. ¶ 24; City MSJ GDMF ¶ 24.)

---

[7] Defendants do not directly contest this assertion. As such, while the only evidence on the issue is Plaintiff's own statements, the Court does not find it disputed.

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk NP

Plaintiff was arrested for two offenses (1) California Penal Code § 243(c)(1) (battery against a peace officer)[8] and (2) California Penal Code § 594(b)(1) (vandalism). (County SUF ¶ 6.) Plaintiff was never cited for a violation of California Vehicle Code § 20002 (hit and run). (City MSJ GDMF ¶ 54.) Plaintiff did not resist arrest. (County MSJ GDMF ¶ 43.) The criminal case against Plaintiff was dismissed prior to trial. (County SUF ¶ 3.)[9]

Officer Stoll reported to Deputy Remington that Plaintiff crashed his vehicle into the rear of Officer Stoll's vehicle. Officer Stoll told Deputy Remington that he thought the crash was intentional because there was nothing obscuring Plaintiff's view. (Id. ¶ 7.)[10] Deputy Remington's report states that Officer Stoll told him that he "walked to Young and grabbed him by his right arm so he could not leave the scene." (City MSJ GDMF ¶ 53.) Officer Stoll did not report to Deputy Remington that Plaintiff had committed a hit-and-run. (Id. ¶ 55.)

Officer Stoll's vehicle had a dent on the right side of the rear bumper, a broken tail light (the cover was cracked), and damage to the passenger-side rear quarter panel. (County SUF ¶ 8.) Plaintiff was driving a Ford Excursion. There were scratches and paint transfers on the left side of the front bumper of Plaintiff's vehicle following the collision. (Id. ¶ 9.)[11] Deputy Remington measured the distance Plaintiff had driven after turning onto the street at 750 feet. It was a straight dirt road. The road itself did not pose any sight obstructions. (Id. ¶ 10.) According to Plaintiff's account provided once litigation had begun, his view of Officer Stoll's vehicle was obstructed because his neighbor, Linda Lewis, had parked her Chevy Suburban in front of Officer Stoll's vehicle. (County MSJ GDMF ¶ 10.) According to Deputy Remington, when he examined the dirt road, he did not see any evidence of Mr. Young braking prior to colliding with Officer Stoll's vehicle. (County SUF ¶ 11.)[12] Plaintiff initially testified at his

---

[8] The Court observes that the proper subsection of Section 243 is probably (b), which prohibits batteries on peace officers such as a "code enforcement officer," not subsection (c), but that discrepancy is immaterial to the analysis below. See California Penal Code § 243.

[9] The Court has omitted certain facts regarding whether Plaintiff was Mirandized and any statements were used against him in violation of Miranda in light of intervening legal authority discussed below, which essentially bars any Miranda claim Plaintiff may assert. Any such facts are now immaterial. As noted below, the absence of certain evidence, is material: Plaintiff has not provided any admissible evidence that un-Mirandized statements were ever used in criminal proceedings, e.g., during or in relation to any hearing, ruling by a judge, or trial. (There was no trial: the case was dismissed.)

[10] Plaintiff disputes the reasonableness of this interpretation and that that could be a legitimate basis for an arrest, but he does not and cannot dispute that this is what Officer Stoll said to Deputy Remington. There is no dispute.

[11] The parties dispute whether this damage was consistent with the impact of Plaintiff's vehicle on Officer Stoll's vehicle.

[12] As noted below, whether or not Plaintiff applied his brakes prior to the collision is disputed. He says he did.

---

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk NP

deposition that he did not see Officer Stoll's vehicle until he hit it, but shortly thereafter clarified that he was unable to see Officer Stoll's vehicle because it was obstructed by his neighbor's Suburban, and that as soon as he reached his neighbor's vehicle he saw Officer Stoll's vehicle; at that point, he was about 10 feet away from Officer Stoll's vehicle, and applied his brakes.  (Id. ¶ 12; County GDMF ¶ 12; Young Dep. 38:9-39:9.)  Plaintiff estimated that he was traveling 20-25 miles per hour down the road, although it is unclear what Plaintiff's final rate of speed was when he collided with Officer's Stoll vehicle. (City SUF ¶ 9; City MSJ GDMF ¶ 9.)  Officer Stoll estimated that Plaintiff was traveling approximately 10 to 15 miles per hour before the collision. (City MSJ GDMF ¶ 62.)

Plaintiff admitted to Deputy Remington that he crashed into Officer Stoll's vehicle and stated that it was an accident; he has consistently maintained that it was an accident.  (County SUF ¶ 12; County MSJ GDMF ¶ 12.)  Deputy Remington believed that the damage to Officer Stoll's vehicle was well in excess of $400, and Officer Stoll told him he thought the damage would exceed $1000.  (County SUF ¶ 13; Remington Declaration 14.)  Ultimately, the damage Plaintiff caused to Officer Stoll's vehicle was over $400.  (City SUF ¶ 22.)[13]

Officer Stoll told Deputy Remington that Plaintiff punched him on his left cheek with his fist.  (County SUF ¶ 14.)[14]  Officer Stoll had a cut or abrasion on his left cheek.  (Id. ¶ 15.)  Deputy Remington was talking to Officer Stoll before Plaintiff arrived at the scene, and he did not observe a cut on Officer Stoll's face before Plaintiff arrived.  (Id.; County MSJ GDMF ¶ 15.)[15]  After Plaintiff crashed his vehicle into Officer Stoll's vehicle, the two engaged in a physical altercation in which Officer Stoll hit Plaintiff in the face at least twice.  (County MSJ GDMF ¶ 64.)

Plaintiff followed all instructions of Deputy Remington.  (County MSJ GDMF ¶ 44.)

---

[13] Plaintiff claims this fact is disputed because there is no "expert cost analysis." Defendants have submitted an initial cost repair estimate from "Gosch Collision" that the damage to the vehicle exceeded $500 and may be as much as $2500, and a later repair estimate from the same company that the repairs cost $4,541.37.  (See Dkt. No. 107-2 Exs. 8, 9.)  If Plaintiff wanted to dispute this fact, he needed to provide an alternate analysis that showed the damage was less than $400.

[14] Plaintiff disputes that this happened but cannot dispute that this is what Officer Stoll said to Deputy Remington.

[15] Plaintiff cannot dispute the existence of a photo that shows a cut.  He also attempts to dispute this fact by providing an alternate account proffered by his daughter about how Officer Stoll might have received the cut, but that does not undermine the existence of the abrasion, and at best provides an alternate explanation of how it occurred.  Plaintiff has supplied no evidence that his daughter told Deputy Remington or any other individual about how she believed Officer Stoll may have received the cut.

Deputy Remington had already made up his mind to arrest Plaintiff and take him to the
Perris Sheriff's Station ("Perris Station" or "Sherriff's Station") for questioning and booking by
the time he left Plaintiff's property.  (Id. ¶ 109.)

### 2. Claims against Officer Johnson, Officer Zalunardo and Deputy Remington and the County in Respondeat Superior

Plaintiff's only contacts with community service officers Officer Johnson and Officer
Zalunardo were during the times they transported him from the Sheriff's Station at the Loma
Linda Medical Center ("the hospital") for an "OK to book" examination, while he was at the
hospital, and from the hospital to the Southwest Detention Center ("jail").  Both of them were
wearing uniforms which included their names.  (County SUF ¶¶ 1, 16, 20; County MSJ GDMF
¶ 16.)  Neither individual was involved in the arrest of Plaintiff.  (County SUF ¶ 16.) Plaintiff
filed a claim with the County, but it did not mention Officer Johnson and Officer Zalunardo by
name or include any description or any events that occurred while at the hospital.  (Id. ¶ 2.)
Following Plaintiff's description of the altercation with Officer Stoll, Plaintiff's claim with the
County states: "I was then taken to jail, where I was treated roughly and denied access to food,
water, and necessary medical care.  As a result of this incident, I suffered severe physical,
psychological, and emotional injuries, trauma, and distress, among other damages.  My pain &
suffering persist to this day." (Dkt. No. 106 Ex. 1.)  Plaintiff's claim for damages provides the
date of Plaintiff's hospital visit and the hospital's name and address.  (Id.)  After the incident,
Plaintiff claims that he was in a state of severe distress, fear, and anxiety, and was unable to form
reliable memories of details such as the names of involved officers.  (County MSJ GDMF ¶ 2.)

On October 7, 2016, Deputy Remington was employed by the County of Riverside as a
Deputy Sheriff.  (County MSJ GDMF ¶ 107.)  On the same date, Officer Johnson was employed
by the County of Riverside as a Community Service Officer.  (Id. ¶ 108.)

### 3. Reports

Officer Johnson and Officer Zalunardo did not prepare any reports concerning Plaintiff.
The only written documents they prepared were logs which stated the start and end times of their
transportation of Plaintiff and the locations to which they transported him.  (County SUF ¶ 17.)
While the truth of underlying statements to Deputy Remington are disputed, the report prepared
by Deputy Remington accurately summarized the statements made by Officer Stoll and Plaintiff
himself.  While the degree of reliability of Deputy Remington's measurements and assessment of
the nature of the vehicle collision are disputed, Deputy Remington's report accurately reported
Deputy Remington's own observations.  (Id. ¶ 18.)[16]  Deputy Remington is not a traffic collision

---

[16] Plaintiff disputes the veracity of statements like those given by Officer Stoll but does
not dispute that Deputy Remington accurately summarized what was said to him.  As noted
below, it is arguably disputed whether Deputy Remington accurately characterized Linda Lewis'
statement.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk NP

expert and did not have specialized equipment in his vehicle that would have aided in the investigation of a traffic collision.  (County MSJ GDMF ¶ 66.)

Deputy Remington did not personally observe the collision of Plaintiff's vehicle with Officer Stoll's vehicle or the physical altercation between them.  As such, he relied on witness statements and his after-the-fact observations when writing his report.  (See County MSJ GDMF ¶¶ 67-68.)  Deputy Remington's report was prepared the same day as the incident.  (Id. ¶ 87.)  Deputy Remington's report does not mention the existence of a video recording of the incident.  (Id. ¶ 89.)  As noted below, Deputy Remington and the Sheriff's Department attempted to retrieve the video, but Plaintiff's wife and sister refused to provide it.  When a County Sheriff identifies an error in his report, he is trained that he should write a supplemental report to correct the error.  (Id. ¶ 90.)

### 4.  Medical Care of Plaintiff

Just before Deputy Remington arrived, Officer Stoll provided Plaintiff with at least one bottle of water so he could use it to wash off the pepper spray by dropping it in his lap.  (Id. ¶ 19; City SUF ¶ 25; City MSJ GDMF ¶ 83.)[17]  Officer Stoll instructed Plaintiff to pour the water from the water bottle onto his face and turn toward the wind.  (City MSJ GDMF ¶ 85.)  After giving Plaintiff the water, Officer Stoll returned to his vehicle.  (Id. ¶ 83.)  Officer Stoll is familiar with the debilitating effects of pepper spray.  (Id. ¶ 84.)  Plaintiff tried to wash the pepper spray residue from his face before Deputy Remington returned to the scene.  (Id. ¶ 87.)  Plaintiff was never given an opportunity to use pressurized water on his face from a hose to remove pepper spray residue.  (Id. ¶ 53.)[18]  While Deputy Remington testified that Plaintiff had been given a bottle of water to wash off his face before he arrived, he did not personally provide Plaintiff with anything to remove the pepper spray residue from his face.  (Id. ¶ 93; Response to County MSJ GDMF ¶ 93.)  Plaintiff did not ask Officer Stoll, Deputy Remington or any other individuals for immediate medical attention or hospitalization while at the scene on his property.  (See City SUF ¶¶ 29-30.)

Deputy Remington did not observe any physical injuries to Plaintiff before putting him in his patrol vehicle or inquire into Plaintiff's injuries at the scene of the incident.  (County MSJ GDMF ¶¶ 78, 80.)  Rather than transport Plaintiff directly to the hospital following the incident with Officer Stoll, Deputy Remington took Plaintiff to the Perris Sheriff's Station for several hours.  (County MSJ GDMF ¶ 54.)  While Plaintiff conveyed to Deputy Remington that he was in pain before being transported to the Perris Station, Deputy Remington informed him that they would go to the Perris Station first, where they would talk about the incident and Deputy Remington would explain why Plaintiff was being arrested.  Then, they would go to the hospital, before booking Plaintiff into jail.  Plaintiff did not request medical care prior to his transportation

---

[17] Plaintiff's citation of additional facts regarding the need to use to a hose to wash off his face does not render this fact disputed.

[18] As noted below, it is disputed whether Plaintiff asked Deputy Remington if he could use the hose to wash off his face.

to the Perris Station, state that he needed to go to the hospital immediately, or object to this sequence of events.  (See County MSJ GDMF ¶ 59; Dkt. No. 131-13, Ex. M.)[19]  In Deputy Remington's report, he states that Plaintiff "sustained black and purple bruising on his left cheek approximately 1" diameter."  (County MSJ GDMF ¶ 79.)  Deputy Remington's report indicates that he was aware that Plaintiff had been hit by Officer Stoll and pepper sprayed.  (Id. ¶ 82.)[20]

County policies require medical clearance for booking in cases where the arrestee was involved in a fight.  (Id. ¶ 83.)  Deputy Remington told Officer Johnson that an "OK to book" was needed because Plaintiff had been pepper sprayed.  (Id. ¶ 84.)  Officer Johnson transported Plaintiff from the Perris Station to the Loma Linda Medical Center.  (Id. ¶ 85.)  Plaintiff complained to Officer Johnson that his face was burning from the pepper spray.  (Id. ¶ 95.)

Plaintiff told Deputy Remington that he takes medication for high blood pressure and about his pre-existing injuries to his back and neck.  While Plaintiff was not given his blood pressure medication while in the custody of Riverside Sheriff's Department, there is no evidence that he asked to be given this medication or that he was denied prescription medication.  (Id. ¶ 55; Remington Depo. 119:5-14, 124:4-12, 143:3-8; see Young Dep.; Young Declaration.)

After arriving at the Loma Linda Medical Center in handcuffs and shackles, Plaintiff was placed in the corner of a room, behind a door, by Officer Johnson.  Plaintiff testified at his deposition that, because he was placed in the corner, he was unable to hear anything that Officer Johnson said to medical personnel.  Plaintiff testified that he asked medical personnel if they could remove the pepper spray from his face, and a woman told him, "Yes.  We have stuff to remove it."  He believed that Officer Johnson prevented medical personnel from removing the pepper spray, but he admits that he was unable to hear anything Officer Johnson said and was unable to cite any factual basis for his belief.  (See County SUF ¶ 20; County MSJ GDMF ¶ 98; Young Dep. 80:11-14, 81:11-82:6.)  When asked what Officer Johnson did to prevent him from receiving medical care at the hospital, Plaintiff testified that he placed him in the corner, away from other individuals.  (Young Dep. 85:10-15.)  He acknowledged that medical staff knew he was

---

[19] Plaintiff cites the recording of his transport to the Perris Station but blatantly mischaracterizes what it shows, claiming that "Deputy Remington ignored Plaintiff Young's pleas for medical care while he was being questioned."  (See County MSJ GDMF ¶ 59.)  First, the cited exhibit is from his transportation to the Perris Station, not while "being questioned."  Second, in no way does it show his "pleas for medical care."  The recording of Plaintiff's questioning by Deputy Remington also does not demonstrate any "pleas for medical care."  (See Dkt. No. 131-14, Ex. N.)  While it is not the Court's role to scrutinize every second of a cited recording to ensure that a lawyer has accurately represented it, it has, in fact, done that, revealing multiple instances of intellectually dishonest representations from Plaintiff's Counsel.

[20] Plaintiff suggests that the report indicates that Deputy Remington was aware that Plaintiff was "struck in the head," probably in an attempt to claim that Deputy Remington should have been aware of possible head trauma or the risk of a concussion.  The report does not indicate such knowledge.

---

there.  (Id. 85:16-19.)  He did not hear Officer Johnson tell medical staff not to provide him with
any treatment.  (Id. 85:20-86-1.)[21]

Plaintiff testified that he only received a sandwich after begging for some food because he
was starving, but his ability to it was restricted because he was handcuffed, and was unable to
finish it because officers took him away before he could eat it all.  (Young Dep. 86:2-11; County
MSJ GDMF ¶ 106.)  When asked, did "CSO Johnson, the male officer, do anything else at the
hospital other than allegedly placing you in a corner on a wheelchair that prevented medical staff
from providing you treatment at the hospital that day?", Plaintiff testified, "No.  I could not hear
him."  (Id. 87-20:24.)  When asked again, "[d]id he do anything other than allegedly placing you
in a corner on a wheelchair to prevent medical staff from providing you treatment that day?",
Plaintiff testified, "I'm going to say it again.  No.  I did not hear him."  (Id. 88:2-6.)  When asked,
"[w]hat do you base that intention off of, that he prevented medical staff from providing you
treatment other than him placing you in a corner in a wheelchair?", Plaintiff testified, "[l]ike I
said, he was the man in charge.  The nurses would have to talk to him first before anybody
touched me."  (Id. 88:7-13.)  Plaintiff testified that he did not hear Deputy Remington tell Officer
Zalunardo or Officer Johnson not to provide him with medical care or not to give him
medications.  (Id. 88:17-25.)[22]

Plaintiff's medical records following the incident initially state the following,
timestamped October 7, 2016, at 4:39 p.m.: "The patient presents following a motor vehicle
collision.  The onset was just prior to arrival . . . Associated symptoms: Burning sensation to the
face, Neck pain and Facial Pain . .  This is a 53-year-old male, with a medical history of
hypertension, who was brought in by police and now presents to the emergency department for
evaluation after being involved in a motor vehicle accident since just prior to arrival.  The patient
was reportedly being chased by police, when he crashed his car. . . . Patient stated that he was
pepper sprayed by police, and punched in the face.  He denies any loss of consciousness.  At this
time, the patient complains of neck pain, facial pain and a burning sensation to the face.  He
reports no other associated complaints."  (County MSJ GDMF ¶ 86; Dkt. No. 106 Ex. 8 at 10.)[23]
Plaintiff's only complaints at the hospital listed in medical records were "neck pain, facial pain

---

[21] Plaintiff contends that his medical records indicate that he has hypertension and that he
was not given any prescribed medication for hypertension at the hospital or while in custody.
(See County MSJ GDMF ¶¶ 100-102.)  Because Plaintiff has submitted no evidence that he
needed treatment or medication at the hospital for hypertension or that he asked for hypertension
medication and was denied it, these facts are irrelevant.

[22] To the extent Plaintiff speculates as to what Officer Johnson may have said or done at
the hospital in the Young Declaration, Defendants' objections as to lack of personal knowledge,
foundation and speculation are SUSTAINED.  Plaintiff admits he has no basis to know what
Officer Johnson may have said to medical personnel because he could not hear anything he said.

[23] This is somewhat confusing because Plaintiff was never "chased by police," but it is
what the records state.  There is no indication in the report that any Defendants misreported the
true facts to medical personnel.

---

and a burning sensation to the face." (County SUF ¶ 23.)[24]  Plaintiff's medical records later
state the following, timestamped October 7, 2016, 5:45 p.m.:

> 53-year-old male ambulatory to the ER today with officers with
> complaints of alleged contusions to the face pepper spraying.
> Patient states that he was pushed from behind pepper sprayed and
> punched repeatedly in the face by a sheriff's officer.  Evaluation
> patient had no signs of trauma to the face head or neck did have
> generalized tenderness with decreased range of motion to the
> cervical spine due to previous surgeries.  Patient's vital signs show
> no fever tachycardia and patient's cranial nerves II through XII
> show no abnormalities, CT scans of the head and maxillofacial
> showed no signs of acute abnormalities.  Patient does have multiple
> postop changes in the cervical spine with neuroforaminal
> narrowing at multiple levels with no acute abnormalities or
> fractures noted.  Patient be discharged and is cleared for jail we
> discharged with medications for spasm due to some loss of lordosis
> noted on CT scan.   Patient was instructed to follow up with his
> primary care physician and again patient was cleared for jail.  All
> indications for immediate reevaluation in the emergency
> department including sudden worsening pain, syncope, numbness,
> tingling, weakness splint to the patient with his verbalized
> understanding.

(Dkt. No. 106 Ex. 8 at 12.)  The medical records also state, "[t]he patient is resting comfortably
in the wheelchair, eating a sandwich, informed the patient of his negative CTs of the
maxillofacial, head and cervical spine.  Plan to discharge to the custody of police, with a
prescription for pain.  The patient understands and agrees to plan." (Id.)  The medical records
indicate that Plaintiff was discharged with a prescription for acetaminophen and baclofen, a
muscle relaxer, along with instructions how to take the medications.  (Id.; County MSJ GDMF
¶ 104.)

   Hospital employees found no injuries other than the effects of pepper spray.  (County
SUF ¶ 24.)[25]  At the hospital, Plaintiff denied any loss of consciousness.  (Id. ¶ 25.)[26]  At the
hospital, medical personnel performed CT scans on Plaintiff.  Those CT scans of Plaintiff's head

---

[24] As noted below, Plaintiff now asserts that he suffers from additional ailments, but it is
undisputed that this is what is listed in his medical records.

[25] As noted below, Plaintiff claims he suffered from additional injuries, but it is
undisputed that this is all that the medical records show.

[26] As noted below, Plaintiff now claims that he lost was in and out of consciousness during
his altercation with Officer Stoll, but it is undisputed that he denied loss of consciousness at the
hospital.

and cervical spine were unremarkable, a neurological exam was normal, and there were no objective indications of any head injury. (Id. ¶ 26.)[27]  The hospital found no signs of trauma to the face, head or neck. (Id. ¶ 27.)  The medical records do indicate that Plaintiff had "generalized tenderness with decreased range of motion to the cervical spine due to previous surgeries." (Id.; Dkt. No. 106 Ex. 8.)  Plaintiff's medical records do not explicitly show that he was provided any treatment to remove any remaining pepper spray residue from his face, but they do cite pepper spray as an issue to be addressed, and show clearance to be booked into jail after necessary treatment was provided. (County MSJ GDMF ¶ 96; Response to County MSJ GDMF ¶ 96.)

Community service officers never transport medication; rather, they bring prescriptions to the jail for jail medical staff to fill. (County SUF ¶ 30.)  Officer Johnson brought all of the medical paperwork from the hospital to the jail. (Id. ¶ 31.)  Plaintiff was given Tylenol when he arrived at the jail. (Id. ¶ 32.)  Plaintiff was released from jail the following morning, and at that point he was free to seek any medication he wanted. (Id. ¶ 33.)

### 5.   Use of Force by County Employees

Deputy Remington never used any violence and never threatened to use any violence against Plaintiff. (Id. ¶ 34.)  Deputy Remington never performed any act with the specific intent of depriving Plaintiff of federal constitutional rights. (Id. ¶ 37.)[28]  Officer Johnson never used any violence and never threatened to use any violence against Plaintiff. (Id. ¶ 35.)  Officer Johnson never performed any act with the specific intent of depriving Plaintiff of federal constitutional rights. (Id. ¶ 38.)[29]

### 6.   Follow-Up Investigation by Deputy Remington and County

Deputy Remington did not question Plaintiff about the incident before he was handcuffed, placed in a patrol vehicle, and transported to the Perris Sheriff's Station for questioning.

---

[27] Plaintiff provides no contrary evidence, certainly that is admissible.  Although it is unclear to what extent he disputes the medical assessment of Dr. Vilke or other medical practitioners as opposed to signs or symptoms he felt, to the extent that Plaintiff attempts to dispute what a CT scan showed, he has no medical expertise and is unqualified to render an expert opinion on that subject.  See Fed. R. Evid. 701, 703.  Defendants' improper expert opinion objections are SUSTAINED to the extent that is what Plaintiff attempts to proffer through the Young Declaration.  This fact is undisputed.

[28] Plaintiff's recitation of evidence in opposition to this fact at best could show a lesser standard of disregard for his constitutional rights.  He has provided no evidence which directly shows, or raises a reasonable inference of, specific intent to deprive him of constitutional rights.

[29] Plaintiff's cited evidence in opposition to this fact fails to raise a genuine dispute of material fact.  He has provided no evidence which directly shows, or raises a reasonable inference of, specific intent to deprive him of constitutional rights.

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk NP

(County MSJ GDMF ¶ 69.)  While Plaintiff was being placed in the patrol vehicle, Plaintiff told
Deputy Remington that he did not do anything wrong and that Officer Stoll had assaulted him.
(See id. ¶¶ 70-71.)

       In his interview with Plaintiff, Mr. Young told his side of the story, explaining that he hit
Officer Stoll's vehicle accidentally because his tires were worn and his vehicle slid.  He also said
that he never hit Officer Stoll.  Deputy Remington told Plaintiff that, between the stories he
heard from Plaintiff and Officer Stoll, he found Officer Stoll's story more reasonable.  He did not
find Plaintiff's story regarding the accidental nature of the collision credible because Plaintiff had
approximately 750 feet of stopping distance to avoid hitting Officer Stoll's car, while Plaintiff hit
the vehicle at a significant speed; he also believed that Plaintiff may have been frustrated or angry
and decided to intentionally hit the car.  He also found Officer Stoll's story more likely because it
did not make sense to him why a code enforcement officer would punch Plaintiff and pepper
spray him without provocation.  To the contrary, he thought it more likely that Plaintiff had
punched Officer Stoll in the face because that would have led Officer Stoll to use force in return,
while the cut on Officer Stoll's face (which Deputy Remington did not observe on Officer Stoll's
face prior to the altercation) must have come from somewhere.  (See Dkt. No. 131-14, Ex. M;
County MSJ GDMF ¶ 72.)

       While at the Perris Sheriff's Station, Plaintiff told Deputy Remington that his property
had a video surveillance system.  (County MSJ GDMF ¶ 45.)  Deputy Remington asked for
Plaintiff's wife's cell phone number so that he could go back to the house and view the video,
which may corroborate Plaintiff's story.  (Young Declaration ¶ 10; Dkt. No. 131-14, Ex. M.)
Deputy Remington spoke with Plaintiff's wife the day of the incident and made arrangements to
get the video from her.  Thereafter, Deputy Remington made at least five phone calls to
Plaintiff's wife over multiple days in an effort to coordinate with her to acquire the video, but she
never returned his calls, which he assumed meant that Plaintiff and his wife did not want him to
acquire the video.  (Remington Dep. 108:1-20.)  While Plaintiff was in custody at the
Southwestern Detention Center, a Riverside County Sheriff's Deputy visited his house looking
for the video recording of the incident with Officer Stoll.  (County MSJ GDMF ¶ 46.)[30]
Plaintiff's sister showed the Deputy the video recording on a laptop but did not give the Deputy
the video.  (Id. ¶ 47.)  A few days after Plaintiff was released from the Southwestern Detention
Center, a Riverside County Sheriff's Deputy pulled up to the gate outside his house early on a
Sunday morning.  Plaintiff's wife asked the Deputy what he wanted.  The Deputy told her he
wanted the video.  Plaintiff's wife refused to give the Deputy the video.  The Deputy then drove
off.  (Id. ¶ 50; Young Declaration ¶ 16.)

       Deputy Remington did not prepare any supplemental reports of the incident.  (County
MSJ GDMF ¶ 48.)  Deputy Remington conducted no further investigation after attempting to
get the surveillance video from Plaintiff's wife.  (Id. ¶ 49.)

---

      [30] The Court can infer that Plaintiff learned of this fact and the one that follows from his
sister.  Although what she said to him would likely be hearsay, it could be presented in an
admissible form at trial: Plaintiff's sister could testify to these facts.

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk NP

In the days following the October 7, 2016 incident, Plaintiff observed multiple marked Riverside Sheriff's Department vehicles driving slowly by his residence, and sometimes stopping outside, at least once per day.  This scared Plaintiff.  (Id. ¶ 51.)

### 7.  Plaintiff's Health History

Prior to this incident, Plaintiff had limited physical mobility as a partial result of a bone being surgically removed from his hip following a vehicle collision in 2000 or 2001.  (County MSJ GDMF ¶ 40.)  Plaintiff's limited mobility was most pronounced in his neck, which was fractured in the vehicle collision.  (Id. ¶ 41.)  Plaintiff's mobility limitations were known to Officer Stoll and Deputy Remington at the time he exited his vehicle and before Plaintiff's arrest, as Plaintiff's limp was obvious to any observer.  (Id. ¶ 42; City MSJ GDMF ¶ 71.)

### 8.  Hiring, Training and Retention of Officer Stoll

Pursuant to City policy, the Code Enforcement Division performed a background check on Officer Stoll prior to his hiring which included contacting Officer Stoll's prior employers and LiveScan fingerprinting.  (City SUF ¶ 33.)[31]  The background check revealed no issues of concern.  (Id. ¶ 34.)

At all relevant times, the Code Enforcement Division of the City requires its Senior Code Enforcement officers to maintain CACEO Certification.  (Id. ¶ 35.)  CACEO is the primary code enforcement education and training entity in California and is the sole entity authorized to certify code enforcement officers.  (Id. ¶ 36.)[32]  To become certified through CACEO, a Code Enforcement Officer must meet CACEO's prescribed education, training, and experience requirements and have passed a comprehensive examination reflective of the demands encountered in the code enforcement profession.  (Id. ¶ 37.)[33]  At all relevant times, the City required its Senior Code Enforcement Officers to participate in ongoing continuing education

---

[31] Plaintiff contends that it is disputed whether a background check on Officer Stoll occurred by citing the testimony of Natalie Jacobs, who testified that she did not know whether a background check on Officer Stoll was performed.  That does not undermine the City's undisputed evidence from the Carlson Declaration that a background check was performed.  Declaration testimony from an individual with personal knowledge of Plaintiff's personnel file is sufficient to show that the background check was performed.  Plaintiff also cites the deposition of Officer Stoll himself, who testified that no background check was performed.  But he would not necessarily know whether or not a background check was performed on him; the City easily could have contacted his prior employers or run a criminal background check without his knowledge.

[32] Plaintiff's attempt to manufacture a dispute by citing irrelevant evidence is unavailing.

[33] Plaintiff's contention regarding a purported lack of training in evaluating the "brightness of a light" is irrelevant because it has nothing to do with the actual harm that Officer Stoll caused him.

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk NP

with CACEO.  (Id. ¶ 38.)  As of March 7, 2014, Officer Stoll completed a Basic Code
Enforcement Officer course that was approved by CACEO.  (Id. ¶ 39.)  CACEO's Basic Code
Enforcement Officer course includes minimum training, qualifications, and experience
requirements for Certified Code Enforcement Officers, including, but not limited to, training and
competency requirements in the areas of investigation and enforcement techniques, application
of remedies, officer safety, and community engagement.  (Id. ¶ 40.)[34]  By completing this
training, Officer Stoll was reclassified as a Senior Code Enforcement Officer.  (Id. ¶ 41.)  At all
relevant times, Officer Stoll's job responsibilities did not include the physical detention of
criminal suspects.  (Id. ¶ 42.)  However, Officer Stoll testified at his deposition that he believed
he had the authority to "put hands on a" citizen as a code enforcement officer and that he
touched Plaintiff because he was "walking away from a felony."  (Stoll Dep. 149:1-10, 150:4-6;
City MSJ GDMF ¶ 118.)[35]  That belief is not supported by the CACEO Regulations.  (City MSJ
GDMF ¶ 119.)  The City's Code Enforcement officers were not permitted to act "as a police
officer" but were solely supposed to engage in Code Enforcement.  (Id. ¶ 131.)  The City itself
did not provide training directly to Code Enforcement Officers; rather, CACEO provided initial
and continuing training.  (Id. ¶ 127.)

Pursuant to City policy, management is required to immediately investigate any report of
a potentially violent situation or person.  (City SUF ¶ 44.)  Prior to October 7, 2016, the date of
the incident, there were no reports of Officer Stoll having any violent outbursts.  (Id. ¶ 45.)[36]

In October 2016, the City did not have any policies or procedures for communicating with
the County of Riverside Sheriff's Department.  (City MSJ GDMF ¶ 92.)  In or around 2021, the
City of Menifee Code Enforcement Division was incorporated into the Menifee Police
Department.  (Id. ¶ 113.)  After incorporation, the City implemented a more extensive
background process for code enforcement officers.  (Id. ¶ 114.)

Officer Stoll's background prior to joining the City's Code Enforcement Division was as a
Sheriff's Deputy.  (Id. ¶ 117.)  At the time Officer Stoll was hired by the City as a Code
Enforcement Officer, the City simply transferred Code Enforcement cases from Riverside to the

[34] While Plaintiff is correct that Cal. Health & Safety Code § 26208 does not, by itself,
prove this fact, there is sufficient evidence supplied by the Carlson Declaration for the Court to
find it to be true.

[35] The City attempts to recharacterize Officer Stoll's testimony as simply stating that he
had the authority to use physical force when he was employed by the County of Riverside while
handling environmental crime, but his actual testimony strongly suggests that he believed he had
the authority to physically detain a suspect while working as a *code enforcement officer*.  (See
Response to City MSJ GDMF ¶ 42.)

[36] Plaintiff contends this is disputed by citation of a series of extraneous pieces of
evidence.  He has provided no evidence that there were any prior violent incidents involving
Officer Stoll or that the City was aware of any such incidents.  There is no genuine dispute of
material fact.

City.  (Id. ¶ 120.)  Officer Stoll testified that the City simply adopted the County's Code
Enforcement references and ordinances.  (Id. ¶ 121.)  Officer Stoll testified that the training he
attended for new Code Enforcement officers lasted approximately two to three weeks, five days a
week.  The "biggest" classes consisted of report writing, what to do if "you get into an accident"
and who to inform, and the "day-to-day operations" on the job.  (Stoll Dep. 54:10-25.)[37]

Officer Stoll was not supposed to be wearing a tactical vest while performing his duties,
but he did.  (City MSJ GDMF ¶ 132.)  The City terminated Officer Stoll's employment after an
incident with a co-worker, Donna Burks, which occurred after the incident with Plaintiff.  During
that incident, Officer Stoll was angry, and Ms. Burks was scared that Officer Stoll might hit her.
(Id. ¶¶ 135-136.)  Ms. Burks testified that she was not aware of any City Code Enforcement
officers who used their pepper spray while working.  (Id. ¶ 128.)  Ms. Burks also testified that she
overheard Officer Stoll in the office talking about "detaining" civilians when he needed to talk to
them.  (Id. ¶ 134.)[38]

Officer Stoll only received one performance evaluation by the City, though he was
supposed to be evaluated on an annual basis.  (Id. ¶ 137.)  The City took no action to investigate
Officer Stoll's actions with respect to the incident with Plaintiff.  (Id. ¶ 138.)  Officer Stoll
referred to the incident with Plaintiff as a "rear end accident" and nothing more.  (Id. ¶ 139.)
The City took Officer Stoll's description of the incident at face value.  (Id. ¶ 140.)  Officer Stoll
did not mention anything about an altercation with regard to the incident with Mr. Young.  (Id.
¶ 141.)  In October 2016, the City did not have any processes to review altercations between code
enforcement officers and civilians.  (Id. ¶ 145.)

**D. Disputed Facts**

Plaintiff denies hitting or punching Officer Stoll.  Defendants assert that Plaintiff did hit
Officer Stoll in the face before Officer Stoll used force on Plaintiff.  (See County MSJ GDMF ¶
63; Response to County MSJ GDMF ¶ 63.)[39]

Defendants assert that Officer Stoll provided Plaintiff with two bottles of water to wash
off his face after being pepper sprayed.  Plaintiff asserts that he was provided with one bottle of

---

[37] Plaintiff mischaracterizes the testimony by claiming that the training did not consist of
"interacting with citizens."  That is not what Officer Stoll testified to, and it is not a reasonable
inference from the testimony.

[38] The Court finds it possible that this evidence could be introduced in admissible form at
trial: if Ms. Burks testified that she heard Officer Stoll make these statements, they would be
statements of a party-opponent.

[39] A clear video could have resolved this dispute.  However, the video evidence supplied
by Plaintiff is extremely grainy, especially the video that magnifies the altercation with Officer
Stoll.  It is impossible for the Court to tell definitively whether or not Plaintiff hit Officer Stoll.  A
reasonable jury could come to either conclusion based on the video and the competing accounts.

water.  (See City SUF ¶ 25; City MSJ GDMF ¶ 25.)  Defendants assert that Plaintiff used the water to rinse out his eyes and face, while Plaintiff contends that, because of his limited mobility, he was unable to tilt his head back far enough to pour water from the water bottle he was given into his eyes to rinse off the pepper spray residue.  (See City SUF ¶ 26; City MSJ GDMF ¶ 26; County MSJ GDMF ¶ 91.)  Plaintiff has provided no evidence that Deputy Remington, Officer Stoll, or any other individual knew of this limitation on tilting his head back.  Defendants assert that nothing prevented Plaintiff from using his hands to put water into his eyes.  (See Response to County MSJ GDMF ¶ 91; Response to City MSJ GDMF ¶ 26.)  It is generally disputed whether the water Officer Stoll provided to Plaintiff was sufficient to address the pepper spray residue on his face and body.  (See City SUF ¶ 31; City MSJ GDMF ¶ 31; Response to City MSJ GDMF ¶ 31.)

It is disputed whether and at what point Plaintiff saw Officer Stoll's vehicle before hitting it and whether he applied his brakes before the collision.  Deputy Remington's report asserted that there were no visual obstructions on the street, which led him to believe that Plaintiff must have seen Officer Stoll's vehicle and led him to conclude that Plaintiff intentionally hit it.  The report does not reference a possible obstruction posed by Linda Lewis's Suburban, which Plaintiff has asserted in his deposition prevented him from seeing Officer Stoll's vehicle until the last moment.  (County SUF ¶ 18; County MSJ GDMF ¶ 18.)  In his interview with Deputy Remington at the Perris Station, Plaintiff did not claim that his vision was obstructed by the Suburban; he only said that the collision was an accident, that he applied his brakes and his tires had low tread, and that his vehicle slid before hitting Officer Stoll's car.  Deputy Remington stated that Plaintiff must have seen Officer Stoll's vehicle; in his response, Plaintiff did not deny that fact, or claim that he failed to see the vehicle.  (See Dkt. No. 131-14, Ex. N.)  Defendants assert that it is physically impossible for Plaintiff not to have seen Officer Stoll's car: the damage to Officer Stoll's vehicle was to the right rear, and any vehicle parked in front of Officer Stoll's vehicle could not have obstructed Plaintiff's view of the rear of the vehicle.  (See Response to County MSJ GDMF ¶ 73.)  Defendants generally assert that there is no evidence that Plaintiff applied his brakes prior to the collision.  (See City SUF ¶ 12.)

Deputy Remington's report states that neighbor Linda Lewis did not know whether the collision was intentional or not but that Mr. Young had been upset about a situation with another neighbor.  (See Response to County MSJ GDMF ¶ 77.)  In his interview with Ms. Lewis, she initially states that she did not believe Plaintiff had intentionally hit Officer Stoll's vehicle because it slid.  When Deputy Remington thereafter tells Ms. Lewis that he believed it must have been intentional, she does not explicitly disagree with him.  (See id.; Dkt. No. 131-12, Ex. L; City MSJ GDMF ¶ 66.)

Plaintiff claims that, following the altercation with Officer Stoll, Deputy Remington returned to the scene and told him that he was being placed in handcuffs.  When Plaintiff asked Deputy Remington if he could wash the pepper spray off his face and stated that he had a water hose by the gate, Deputy Remington told him that he could not wash it off.  (County MSJ GDMF

¶ 92.) Defendants deny that any statement was made. (Response to County MSF GDMF
¶ 92.)[40]

In addition to neck pain, facial pain and a burning sensation to the face listed in his
medical records, Plaintiff claims to have been suffering from extreme pain at the hospital that
included jaw and neck pain. (County MSJ GDMF ¶ 23.) While hospital records indicate that
medical personnel only found that Plaintiff was suffering from the effects of pepper spray,
Plaintiff also claims to have suffered mental and emotional injuries, bruising on his face, injury to
his neck, migraines, and memory loss from the incident. (Id. ¶ 24; City MSJ GDMF ¶¶ 101-103,
105.) While Plaintiff denied loss of consciousness at the hospital, he now asserts that he was in
and out of consciousness during the altercation with Officer Stoll. (Id. ¶ 25.) Plaintiff also claims
to have suffered from severe emotional distress as a result of the incident, for which Defendants
generally deny liability. (See County MSJ GDMF ¶¶ 111-112.)

### III.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving
party has the initial burden of identifying the portions of the pleadings and record that it believes
demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317,
323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party
need not produce evidence negating or disproving every essential element of the non-moving
party's case. Id. at 325. Instead, the moving party need only prove there is an absence of
evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376,
387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be
but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that
there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324.
The non-moving party must make an affirmative showing on all matters placed at issue by the
motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477
U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury
could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is
not a light one. The non-moving party must show more than the mere existence of a scintilla of
evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the
light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.

---

[40] Defendants note that the recording of Plaintiff's transportation to the station and the
recording of Plaintiff's interview at the station contain no such statement, but that is not the time
period when Plaintiff claims to have made the statement. There is no video or audio that
definitively proves or disproves whether Plaintiff made this statement, so it remains in dispute.

1991).  Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV.   DISCUSSION

County Defendants move for summary judgment on all remaining claims in the operative complaint, the TAC.  (See County MSJ.)  City Defendants move for partial summary judgment on two claims in the TAC asserted against the City and Officer Stoll: Plaintiff's seventh cause of action (false arrest and false imprisonment) and ninth cause of action (negligence).  The Court evaluates Defendants' arguments in turn.  As discussed below, the Court finds summary judgment appropriate for the remaining County employees and the County itself on all claims, and thus GRANTS the County MSJ in its entirety.  While the Court finds that a theory of negligence asserted by Plaintiff is not viable against City Defendants, the Court does not find that City Defendants are entitled to judgment as a matter of law on either claim for which they move for summary judgment.  As such, the Court GRANTS-IN-PART and DENIES-IN-PART the City MSJ.

### A. County MSJ

#### 1.   Compliance with Pre-Litigation Claim Filing Requirements

County Defendants argue that Plaintiff's state law claims against Officer Johnson and the County itself (sued in respondeat superior) are barred to the extent Plaintiff failed to comply with pre-litigation claim filing requirements.  (County MSJ at 3.)[41]  Specifically, County Defendants argue that Plaintiff's government claim for damages failed to mention Officer Johnson or any failure to provide medical care prior to Plaintiff being booking into jail, precluding claims applicable to Officer Johnson (for which the County is liable in respondeat superior) and pre-jail medical care.  (See id. at 3-5.)

The California Tort Claims Act ("CTCA"), also known as the Government Claims Act ("GCA"), governs actions against public entities and public employees.  See Cal. Gov. Code §§ 810 et seq., 905, 910, 911.2, 950.4, 950.6.  Under the GCA, a plaintiff seeking damages from a public entity or its employees must present a claim to the entity before filing suit in court, generally not later than six months after the cause of action accrues.  See Cal. Gov. Code §§ 905, 910, 911.2, 950.4, 950.6.  With certain exceptions, an action against a public entity on a cause of action for which a claim must be presented must be commenced "not later than six months" after the public entity rejects the claim.  See id. § 945.6.  With certain exceptions, the claim "shall show all of the following," among other things: (c) "The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted": (d) "A general description of the indebtedness, obligation, injury, damage or loss incurred so far as it

---

[41] County Defendants raise this same argument as to Officer Zalunardo, but as noted above, she has been dismissed from the action with prejudice, mooting the argument as to her.

may be known at the time of the presentation of the claim"; (e) "The name or names of the public employee or employees causing the injury, damage, or loss, if known." Id. § 910.

Federal courts require compliance with the GCA, and failure to do so precludes a plaintiff from bringing claims under California law against a public entity or public employee. Hacienda La Puente Unified Sch. Dist. of L.A. v. Honig, 976 F.2d 487, 495 (9th Cir. 1992). "The filing of a claim is a condition precedent to the maintenance of any cause of action against the public entity and is therefore an element that a plaintiff is required to prove in order to prevail." DiCampli-Mintz v. County of Santa Clara, 55 Cal. 4th 983, 990 (2012) (quoting Del Real v. City of Riverside, Cal. App. 4th 761, 767 (2002)); accord Mangold v. Cal. Pub. Utils. Comm'n, 67 F.3d 1470, 1477 (9th Cir. 1995); see, e.g., Mohsin v. Cal. Dep't of Water Res., 52 F. Supp. 3d 1006, 1017 (E.D. Cal. 2014) (dismissing claim for failure to allege compliance with the GCA's presentation requirement). "The failure to exhaust an administrative remedy is a jurisdictional, not a procedural, defect. Thus, instead of abating an action as premature, a trial court must grant summary judgment and dismiss the suit upon a finding that a party has not exhausted his or her administrative remedies." Miller v. United Airlines, Inc., 174 Cal. App. 3d 878, 890 (Ct. App. 1985).

"The policy underlying the claims presentation requirements is to afford prompt notice to public entities. This permits early investigation and evaluation of the claim and informed fiscal planning in light of prospective liabilities." Willis v. City of Carlsbad, 48 Cal. App. 5th 1104, 1118 (2020) (internal quotations and citation omitted). The public policy goals underpinning the claim filing requirements are substantial:

> Public policy supports the strict application . . . of the claims presentation requirements: Requiring a [claimant] . . . to first present a claim to the entity, before seeking redress in court, affords the entity an opportunity to promptly remedy the condition giving rise to the injury, thus minimizing the risk of similar harm to others. . . . It . . . also permits the public entity to investigate while tangible evidence is still available, memories are fresh, and witnesses can be located. . . . Fresh notice of a claim permits early assessment by the public entity, allows its governing board to settle meritorious disputes without incurring the added cost of litigation, and gives it time to engage in appropriate budgetary planning. . . . The notice requirement . . . thus is based on a recognition of the special status of public entities, according them greater protections than nonpublic entity defendants, because . . . public entities . . . will incur costs that must ultimately be borne by the taxpayers."

Id. at 1120 (internal quotations, brackets and citations omitted); see also Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth., 34 Cal. 4th 441, 446 (2004) ("The purpose of these statutes is 'to provide the public entity sufficient information to enable it to adequately

investigate claims and to settle them, if appropriate, without the expense of litigation.'") (citation omitted).

It is undisputed that Plaintiff's claim failed to mention Officer Johnson. (County SUF ¶ 2.) Generally, a cause of action against a public employee is barred if the claim submitted did not name the public employee in the claim for damages. See Cal. Gov. Code § 950.2. Nonetheless, "[a] cause of action against a public employee or former public employee is not barred by Section 950.2 if the plaintiff pleads and proves that he did not know or have reason to know, within the period for the presentation of a claim to the employing public entity as a condition to maintaining an action for such injury against the employing public entity, . . . that the injury was caused by an act or omission of the public entity or by an act or omission of an employee of the public entity in the scope of his employment as a public employee." Cal. Gov. Code § 950.4. As the plain language of these statutory provisions show, a plaintiff may maintain a cause of action against a public employee whose identity she did not know "provided she can plead and prove . . . [that] she did not know or have reason to know the identities of the public employees who caused her injury and damages. Necessarily, of course, she must also plead the names of all the public employees whose acts or omissions caused her injuries and damages." Williams v. Braslow, 179 Cal. App. 3d 762, 773 (Ct. App. 1986). The California Supreme Court has squarely held, in light of "overwhelming case law and history," that a "a plaintiff must allege facts demonstrating or excusing compliance with the claim presentation requirement. Otherwise, his complaint is subject to a general demurrer for failure to state facts sufficient to constitute a cause of action." State of California v. Superior Ct., 32 Cal. 4th 1234, 1243 (2004). Federal courts follow these strictures. See, e.g., D.K. ex rel. G.M. v. Solano Cnty. Off. of Educ., 667 F. Supp. 2d 1184, 1195 (E.D. Cal. 2009) ("A plaintiff must allege facts demonstrating either compliance with the Government Tort Claims Act requirement or an excuse for noncompliance as an essential element of the cause of action. . . . Failure to allege compliance or an excuse for noncompliance constitutes a failure to state a cause of action and results in a dismissal of such claims.") It is also undisputed that Plaintiff failed to plead the exception set forth in Section 950.4 in the operative pleadings, the TAC, or any of her prior complaints, for that matter. The TAC simply states, "[o]n or about March 27, 2017, YOUNG filed a Claim for Damages with [the City and County] related to the unprovoked attack upon him by STOLL and his subsequent unlawful arrest. MENIFEE and COR denied YOUNG's claims on or about April 10, 2017 and April 25, 2017, respectively. As such, YOUNG has exhausted the appropriate administrative remedies prior to the filing of this lawsuit." (TAC ¶ 70.)

The Court is inclined to believe Plaintiff's representation that, because of the trauma he experienced on the day of the incident, he was unable to take note of specific details like Officer Johnson's name, and thus may have lacked knowledge of his identity or cannot be fairly charged with such knowledge. (See County MSJ GDMF ¶ 2.) The Court is also persuaded that public policy considerations may warrant balancing a public entity's need for fair notice with latitude toward an aggrieved individual, especially one who is unrepresented in the time period following his injury. See Stockett, 34 Cal. 4th at 446 ("As the purpose of the claim is to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions . . . the claims statute 'should not be applied to snare the unwary where its

purpose has been satisfied'" (citations omitted).  But the Court is not aware of any authority that
would allow it to excuse a plaintiff's wholesale failure to plead an applicable exception in his
operative complaint; Plaintiff cites none.  The Court is also not persuaded that equitable
considerations warrant a departure from the express provisions of the statutory scheme when, at
all relevant times, Plaintiff has been represented by Plaintiff's Counsel, who, as experienced
litigators, should have known of the importance of filing a sufficient governmental claim on their
client's behalf before filing suit, and thereafter filing a sufficient pleading excusing any earlier
failure to name an unidentified municipal employee.  The Court therefore finds that any claims
against Officer Johnson are barred.

   For similar reasons, the Court agrees with the County that Plaintiff's claim lacks *any*
reference to medical care denied him prior to being booked into jail, which deprived County
Defendants with fair notice of the nature of his claims and therefore an opportunity to investigate
Mr. Young's potential causes of action and to settle them, avoiding the considerable expenditure
of litigation.  Because the purpose of the claim filing requirements is "to provide the public entity
sufficient information to enable it to adequately investigate claims and to settle them, if
appropriate, without the expense of litigation," "a claim need not contain the detail and
specificity required of a pleading, but need only 'fairly describe what [the] entity is alleged to
have done.'"  Stockett, 34 Cal. 4th at 446 (citations omitted).  "[T]he factual circumstances set
forth in the written claim must correspond with the facts alleged in the complaint; even if the
claim were timely, the complaint is vulnerable to a demurrer if it alleges a factual basis for
recovery which is not fairly reflected in the written claim."  Nelson v. State of California, 139 Cal.
App. 3d 72, 79 (1982).  Thus, "in considering whether a claim substantially complies with the
Government Tort Claims Act, the claim should be viewed in its entirety and a determination
made as to whether the claim is susceptible to an interpretation that reasonably enables the public
entity to make an adequate investigation and settle the claim."  Connelly v. County of Fresno,
146 Cal. App. 4th 29, 40 (2006).  The California Supreme Court has summarized the difference
between a compliant and noncompliant governmental claim as follows:

> The claim, however, need not specify each particular act or
> omission later proven to have caused the injury. . . . A complaint's
> fuller exposition of the factual basis beyond that given in the claim
> is not fatal, so long as the complaint is not based on an "entirely
> different set of facts." . . . Only where there has been a "complete
> shift in allegations, usually involving an effort to premise civil
> liability on acts or omissions committed at different times or by
> different persons than those described in the claim," have courts
> generally found the complaint barred. . . . Where the complaint
> merely elaborates or adds further detail to a claim, but is predicated
> on the same fundamental actions or failures to act by the
> defendants, courts have generally found the claim fairly reflects the
> facts pled in the complaint.

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk NP

Stockett, 34 Cal. 4th at 447 (internal citations omitted).  Likewise, federal courts ask whether a plaintiff is "attempting to premise liability on an entirely different factual basis that was set forth in" the claim.  D.K., 667 F. Supp. 2d at 1197.

With regard to denial of medical care, following Plaintiff's description of the altercation with Officer Stoll, Plaintiff's claim with the County states: "I was then taken to jail, where I was treated roughly and denied access to food, water, and necessary medical care.  As a result of this incident, I suffered severe physical, psychological, and emotional injuries, trauma, and distress, among other damages.  My pain & suffering persist to this day."  (Dkt. No. 106 Ex. 1.)  As set forth in the TAC and as discussed below, Plaintiff alleges that County Defendants denied him adequate medical care immediately following his altercation with Officer Stoll, prior to his hospitalization, and at the hospital.  But in his claim for damages, Plaintiff only alleged that he was "denied access to . . . necessary medical care" once he was "taken to jail."  The Court is supposed to view a claim "in its entirety" and determine whether it is "susceptible to an interpretation  that reasonably enables the public entity to make an adequate investigation and settle the claim."  Connelly, 146 Cal. App. 4th at 40.  In other words, the Court is supposed to generously construe a claim to encompass a later-filed cause of action if there is any way to read the claim as referencing such a basis for liability.  But there is simply no way to stretch the allegations in Plaintiff's governmental claim to encompass the denial of medical care prior to being booked into jail.  Indeed, to base a claim for denial of adequate care prior to his booking into jail is a "complete shift an allegations . . . involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim," not the "same fundamental actions or failures to act by the defendants."  Stockett, 34 Cal. 4th at 447.  The only fair reading of Plaintiff's claim as it relates to the medical care causes of action he asserts now is that he is "attempting to premise liability on an entirely different factual basis that was set forth in" the claim.  D.K., 667 F. Supp. 2d at 1197.  The ramifications of this failure extend far beyond mere technical noncompliance.  Indeed, the purpose of these statutes is to allow the government to conduct an investigation, evaluate whether a claimant has a legitimate grievance, and try to settle the claim before he files suit, saving taxpayer money in the process.  How was the County supposed to have any idea that Plaintiff would later claim he was denied medical care by Deputy Remington at the scene of the altercation or at the Sheriff's Station, by Officer Johnson at the hospital, or perhaps others, when all he alleged was that his care while *in jail* was inadequate?  The two sets of allegations would require fundamentally different investigations, into different people at different times, and indeed separate departments and divisions.  The basis for legal liability and the potential strength of legal claims may also differ when a claimant asserts he was denied medical care before or after becoming a prisoner, i.e., while incarcerated in a detention facility.  The County was deprived of a fair opportunity to understand the basis for Plaintiff's claims, investigate them, and potentially settle them before Mr. Young filed suit.  There is no obvious basis for excusing such failure when the inadequacies of Plaintiff's claim can be attributed to Plaintiff's Counsel, who should have known better.

For these reasons, the Court GRANTS the County MSJ as to Officer Johnson for all claims asserted against him and all claims against the County predicated on respondeat superior liability against him.  The Court also GRANTS the County MSJ as to all bases for liability against

it or its employees, including Officer Johnson and Deputy Remington, based on an alleged failure to provide adequate medical care prior to Plaintiff's booking into jail, namely Plaintiff's third, seventh, eighth, ninth and tenth causes of action. Since there are alternate bases or additional liability asserted under those causes of action, the Court assesses those bases for liability against the County and its employees before granting summary judgment on those claims in their entirety.[42]

### 2. Claims Based on Alleged <u>Miranda</u> Violations: Second and Tenth Causes of Action

County Defendants argue that Plaintiff cannot maintain any constitutional cause of action based in whole or in part on a purported violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). (County MSJ at 6-7.) Plaintiff claims that he was not read his <u>Miranda</u> rights upon arrest, which forms the partial basis for his second (false arrest and imprisonment pursuant to Section 1983) and tenth (Bane Act) causes of action. (<u>See</u> TAC.)

Shortly after the County MSJ was filed, the Supreme Court squarely held that a plaintiff cannot sue for damages under 42 U.S.C. § 1983 based on the allegedly improper use of an "un-<u>Mirandized</u> statement in a criminal prosecution." <u>Vega v. Tekoh</u>, 142 S. Ct. 2095, 2099 (2022). As the Supreme Court reasoned, "[i]f a <u>Miranda</u> violation were tantamount to a violation of the Fifth Amendment," then Section 1983 would provide a plaintiff a potential basis for relief. <u>Id.</u> at 2101. But in <u>Vega</u>, the Supreme Court stated that its prior precedents made clear that "<u>Miranda</u> itself and . . . subsequent cases make clear that <u>Miranda</u> imposed a set of prophylactic rules. Those rules, to be sure, are 'constitutionally based,' . . . but they are prophylactic rules nonetheless." <u>Id.</u> at 2101 (internal citation omitted). Even so, the Supreme Court considered whether, although not based on a violation of constitutional law, a plaintiff could maintain an action under Section 1983 for a deprivation of rights, privileges or immunities secured by "federal 'law'" generally. <u>Id.</u> at 2106. <u>Vega</u> held that a plaintiff could not. <u>Id.</u> at 2107. In sum, <u>Vega</u> held that "a violation of <u>Miranda</u> is not itself a violation of the Fifth Amendment" and

---

[42] County Defendants raised similar arguments for dismissal at the pleadings stage but failed to supply Plaintiff's actual claim for damages or ask the Court to take judicial notice of it. (<u>See</u> Complaint Order; FAC Order.) As such, the Court was required to accept Plaintiff's allegations regarding his compliance with claim-filing requirements as true. <u>See</u> <u>D.K.</u>, 667 F. Supp. 2d at 1195 ("Generally at this stage, all allegations of material fact must be accepted as true and construed in the light most favorable to the Plaintiffs. If true, Plaintiffs have satisfied the Government Tort Claims Act requirement and have alleged this fact in their TAC. However, the allegations of the complaint are not accepted as true if they contradict or are inconsistent with facts judicially noticed by the court. Therefore, the Court must determine whether, as Defendants contend, the judicially noticed Government Claims contradict or are inconsistent with Plaintiffs' allegation that they have complied with the Government Tort Claims Act."). Now that the Court has actually had an opportunity to see the claim Plaintiff filed in relation to the substantive nature of the causes of action he asserts, summary judgment is appropriate. Of course, had County Defendants properly raised the argument they do now at the pleadings stage, the Court would have reached the same result.

---

**CIVIL MINUTES—GENERAL**        Initials of Deputy Clerk <u>NP</u>

there was "no justification for expanding Miranda to confer a right to sue under § 1983." Id. at 2108.  Despite County Defendants' citation to Vega in subsequent briefing, Plaintiff has never acknowledged it, all but conceding that he cannot maintain a claim for damages under Section 1983 based on any purported Miranda violation.  It is just as well that Plaintiff has exercised his right to remain silent on this question, for there is nothing he could have said that could get around Vega's clear bar as to his allegations regarding Miranda violations, at least as far as his Section 1983 claim is concerned.

That said, Vega clearly rooted its holding in the context of a Section 1983 claim, while Plaintiff also alleges a Miranda violation under the Bane Act, under California law.  (See TAC.)  The Court is not aware of any authority applying Vega to the Bane Act context as yet, but it is all but impossible to imagine that the result would be any different.  Subject to additional requirements discussed below regarding interference by "threat, intimidation or coercion," the Tom Bane Civil Rights Act ("Bane Act") provides a cause of action for violations of rights "secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state," i.e., California.  Cal. Civ. Code § 52.1(b).  Regardless of whether the Supreme Court's revisionist history as to the constitutional import of Miranda warnings in Vega is correct,[43] it is beyond dispute that they are a creature of federal, not state, law.  It follows that Plaintiff's Bane Act claim regarding Miranda must be predicated on a violation of the "Constitution or laws of the United States."  See Cal. Civ. Code § 52.1(b).  Vega strongly suggests, even if it does not outright hold, that Miranda warnings are not the kind of "law of the United States" that are actionable in civil suits.  See 142 S. Ct. at 2106-08.  Applying that logic, there is no predicate violation of federal law, which necessarily defeats a Bane Act claim.  Thompson v. County of Los Angeles, 142 Cal. App. 4th 154, 173 (2006) ("Without any violation, there is no conduct upon which to base any claim under Civil Code section 52.1.").[44]

But even if the Court were to find that Plaintiff's Bane Act claim is actionable where his Section 1983 claim is not, the Court would still find that summary judgment is appropriate on Plaintiff's Miranda claims because he has failed to supply any evidence of a necessary element of such a cause of action: that any evidence was actually used against him in criminal proceedings in

---

[43] See Vega, 142 S. Ct. at 2108 (Kagan, J., joined by Breyer and Sotomayor, JJ., dissenting) ("The Court's decision in Miranda v. Arizona, 384 U.S. 436 (1966), affords well-known protections to suspects who are interrogated by police while in custody.  Those protections derive from the Constitution: Dickerson v. United States tells us in no uncertain terms that Miranda is a 'constitutional rule.'  530 U.S. 428, 444 (2000).").

[44] Of course, the result would be different if the Court had held that Defendants were entitled to judgment at the second step of a qualified immunity analysis, not the absence of an underlying violation of federal law.  A qualified immunity defense is inapplicable to Bane Act claims.  Venegas v. County of Los Angeles, 153 Cal. App. 4th 1230, 1243 (2007).

violation of <u>Miranda</u>.[45] "The Fifth Amendment is not violated 'unless and until allegedly coerced statements were used against the suspect in a criminal case.' . . . Because 'the core of the guarantee against compelled self-incrimination is the exclusion' of compelled, incriminating evidence at trial, . . . and there is a completed violation of such a right only if the testimony is used at trial," there is no basis for civil liability unless statements obtained in violation of Miranda are actually used in criminal proceedings against a plaintiff.  <u>Chavez v. Robinson</u>, 12 F.4th 978, 995 (9th Cir. 2021) (internal citations omitted) (holding as such in context of Section 1983 claim).  It is undisputed that the criminal case against Plaintiff was dismissed prior to trial. (County SUF ¶ 3.)  Plaintiff argues that "Defendants . . . seemingly overlook Plaintiff's allegations in the TAC that pre-<u>Miranda</u> statements against him were used in Court." (Opposition to County MSJ at 9.)  But the only specific reference to any criminal proceedings Plaintiff cites is an allegation in the TAC that "[o]n or about December 2, 2016, YOUNG appeared at an arraignment hearing in Riverside County Superior Court stemming from the false allegations that YOUNG committed battery upon STOLL (Case No. SWM1604573)."  (<u>Id.</u> at 9 n.5) (quoting TAC ¶ 69).  Whatever the merits of Plaintiff's <u>Miranda</u> claims based on the *pleadings*, such allegations are irrelevant at the summary judgment stage.  County Defendants have supplied evidence in support of their contention that no statements obtained prior to <u>Miranda</u> warnings were used against Plaintiff in court.  (<u>See</u> County SUF ¶ 5.)  Plaintiff has not provided any admissible evidence regarding the arraignment hearing or any other part of the criminal proceedings against him, let alone evidence that demonstrates any evidence was used against him in violation of <u>Miranda</u>.  Quite clearly, County Defendants have met their initial burden as the moving party to demonstrate an absence of evidence to support Plaintiff's case, and Mr. Young has supplied no evidence sufficient to raise a genuine dispute of material fact in response.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322-23; <u>Anderson</u>, 477 U.S. at 248.

Because Plaintiff has not shown (and almost certainly cannot show) that any statements were used against him in criminal proceedings in violation of <u>Miranda</u>, County Defendants are entitled to judgment as a matter of law on all Mr. Young's claims related to <u>Miranda</u> violations.  The Court GRANTS the County MSJ as to Plaintiff's second and tenth causes of action to the extent they are predicated on alleged <u>Miranda</u> violations.

### 3. False Arrest and False Imprisonment Claims against County Employees and the County: Second, Seventh, Eighth, Ninth and Tenth Causes of Action

County Defendants move for summary judgment on all claims asserting false arrest or false imprisonment.  (County MSJ at 7.)  Plaintiff's second cause of action is a Section 1983 claim against Deputy Remington for false arrest and false imprisonment.  Plaintiff also bases other

---

[45] The Court has reviewed the audio recording of Deputy Remington's interview with Plaintiff.  The recording makes clear that Deputy Remington read Plaintiff his <u>Miranda</u> rights before questioning him.  The Court agrees with Plaintiff that his response to the warnings is not audible.  The Court will thus assume without deciding that there is a genuine dispute of material fact as to whether Mr. Young actually waived his <u>Miranda</u> rights, however unlikely that assumption may be.

claims in part on false arrest or false imprisonment: his seventh (false arrest and false imprisonment against all Defendants under state law), eighth (intentional infliction of emotional distress against all Defendants), ninth (negligence against all Defendants), and tenth (Bane Act claim against all Defendants) causes of action. (See TAC.) Generally, County Defendants argue that Deputy Remington had probable cause to arrest Plaintiff for violations of California Penal Code Sections 242 or 243 (battery) and 594 (vandalism), while there is no basis for liability against other County Employees (e.g., Officer Johnson) or the County in respondeat superior. (See County MSJ at 8-11.)

To begin, since any "false imprisonment" claim Plaintiff may assert is predicated on a lack of probable cause to arrest him, the "false arrest" and "false imprisonment" inquiries are the same. See Fayer v. Vaughn, 649 F.3d 1061, 1064 (9th Cir. 2011) ("Fayer's false arrest, false imprisonment, and related § 1983 claims hinge on his allegation that Vaughn lacked probable cause to arrest him."); Hamilton v. City of San Diego, 217 Cal. App. 3d 838, 843 (Ct. App. 1990), modified (Oct. 30, 1990) (explaining that no cause of action for false arrest or false imprisonment lies when an arrest is lawfully based on probable cause); Moore v. City & County of San Francisco, 5 Cal. App. 3d 728, 735 (Ct. App. 1970) ("Imprisonment based upon a lawful arrest is not false, and is not actionable in tort. . . . On the other hand, since an arrest involves detention or restraint, false arrest always involves an imprisonment, and a suit for false imprisonment automatically embraces the wrongful arrest; and two separate torts are not involved.") (citations omitted). Thus, whether asserted under Section 1983 or under state law, Plaintiff's allegations regarding false arrest and false imprisonment rise and fall with the presence or absence of probable cause to arrest him. See Velazquez v. City of Long Beach, 793 F.3d 1010, 1019 (9th Cir. 2015) ("A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification."); Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) (holding that, to prevail on a false arrest claim, a plaintiff must establish that "there was no probable cause to arrest him"); Lacey v. Maricopa County, 693 F.3d 896, 918 (9th Cir. 2012) (en banc). Put another way, "[a] warrantless arrest is reasonable if the officer has probable cause to believe" that the suspect has committed a crime. District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018); Devenpeck v. Alford, 543 U.S. 146, 153 (2004).

The test for probable cause under federal and state law is essentially the same. Under federal law, "[p]robable cause exists when, at the time of arrest, the agents know reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." Allen v. City of Portland, 73 F.3d 232, 237 (9th Cir. 2005) (citation and quotation omitted). Probable cause depends on the totality of the circumstances known to the officers at the time of the arrest, including the reasonable conclusions that can be drawn from the facts known to the arresting officer at the time of the arrest. See Devenpeck, 543 U.S. at 153; Lacey, 693 F.3d at 918. "To determine whether an officer had probable cause for an arrest, courts examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Wesby, 138 S. Ct. at 586 (citation and quotations omitted). Probable cause "is not a high bar"—it "requires only a probability or

substantial chance of criminal activity, not an actual showing of such activity." Id. (citations and quotations omitted).  Under California law,

> The existence of probable cause depends upon facts known by the arresting officer at the time of the arrest. . . . Probable cause for an arrest is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. . . . Probable cause may exist even though there may be some room for doubt. . . . The test in such a case is not whether the evidence upon which the officer made the arrest is sufficient to convict but only whether the [accused] should stand trial.

Hamilton, 217 Cal. App. 3d at 844 (internal quotations and citations omitted).

County Defendants argue that Deputy Remington had probable cause to arrest Plaintiff for battery on Officer Stoll (Penal Code § 242, or more specifically, § 243(c)(1), for battery on an officer) or for vandalism (Penal Code § 594).  The Court holds that there is no genuine dispute of material fact that would preclude summary judgment as to the existence of probable cause to arrest Plaintiff for battery.  As such, it need not reach the existence of probable cause for vandalism.

Under California law, "[a] battery is any willful and unlawful use of force or violence upon the person of another."  Cal. Penal Code § 242.  California Penal Code Section 243 in turn makes it unlawful to commit a battery upon certain officers, including a "code enforcement officer" like Officer Stoll.  See id. § 243(b), (c).  Hitting any individual in the face, including a code enforcement officer, obviously constitutes battery.[46]  As discussed above, there remains disputed facts as to whether or not Plaintiff did, in fact, hit Officer Stoll: Plaintiff has consistently denied hitting him, while Defendants claim he did.  (See County MSJ GDMF ¶ 63; Response to County MSJ GDMF ¶ 63.)  A clear video might have resolved any dispute, but the security footage taken from Plaintiff's property does not decide the issue one way or the other.  The video appears to be taken from at or near Plaintiff's front door, which is far away from where the altercation with Officer Stoll took place: beyond his driveway and outside his gate.  The unmagnified footage is thus too far to tell with certainty what transpired.  The magnified footage reveals an image that is closer to the action, but at the expense of clarity: it is so grainy that the Court once again cannot tell whether or not Plaintiff hit Officer Stoll first.  But whether or not Plaintiff did, in fact, hit Officer Stoll is not the question.  The probable cause analysis considers "historical facts," Wesby, 138 S. Ct. at 586, or the facts known to the officer at the time of the arrest.  Allen, 73 F.3d at 237; Devenpeck, 543 U.S. at 153; Lacey, 693 F.3d at 918.  Thus, the only

---

[46] Unless, of course, an individual acts in self-defense or some other defense applies, but no such defense is applicable here: Plaintiff has never contended that he hit Officer Stoll in self-defense.  He has consistently denied hitting Officer Stoll.  Thus, the only question is whether or not Deputy Remington had probable cause to believe Plaintiff hit Officer Stoll.

relevant question is whether Deputy Remington had sufficient cause to *believe* that Plaintiff hit Officer Stoll, not whether or not he actually did. It is not disputed that Deputy Remington was at the scene prior to Plaintiff's arrival, but that he left the immediate scene during the most relevant period: when Plaintiff crashed into Officer Stoll's vehicle and the two engaged in a subsequent altercation.[47] Deputy Remington then returned to the scene after the altercation. As such, he did not see whether or not Plaintiff hit Officer Stoll. It is also undisputed that Officer Stoll *told* Deputy Remington that Plaintiff punched him on his left cheek with his fist. (County SUF ¶ 14.) While few would suggest that an uncorroborated allegation like that is sufficient for a reasonable officer to make an arrest, see Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001) ("In establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses"), that is not the only evidence known to Deputy Remington at the time he made the probable cause decision. Cf. Peng v. Hu, 335 F.3d 970, 979 (9th Cir. 2003) ("We conclude that the presence of a factual dispute regarding a victim's complaint at the scene of an alleged domestic disturbance does not defeat probable cause if: 1) the victim's statements are sufficiently definite to establish that a crime has been committed; and 2) the victim's complaint is corroborated by either the surrounding circumstances or other witnesses."). It is also undisputed that Officer Stoll had a cut or abrasion on his left cheek, which is exactly where Officer Stoll said Plaintiff hit him. (County SUF ¶ 15.) A reasonable officer could have easily concluded that this physical evidence was consistent with the allegation and thus corroborative physical evidence of it. But Deputy Remington had an additional reason to believe that it was caused by Plaintiff's hand, for he had ruled out the possibility that Officer Stoll's apparent injury came from some other, prior incident. Because Deputy Remington was on scene before Plaintiff arrived, he talked to Officer Stoll face-to-face, and thus had an opportunity to see for himself whether the abrasion was there prior to the altercation with Plaintiff. Deputy Remington has consistently maintained that he did not observe the abrasion on Officer Stoll's face before Plaintiff arrived, and since he came back to the scene right after the altercation, he had eliminated in his mind any other alternate possibility for how Officer Stoll could have received that mark. (Id.; County MSJ GDMF ¶ 14.)[48] The other evidence known to Deputy Remington also circumstantially supports the notion that Plaintiff may have hit Officer Stoll: Deputy Remington explained that he believed Plaintiff was angry about the dispute with his neighbor that led to Officer Stoll's arrival, and he had also (somewhat inexplicably) rammed into the back of Officer Stoll's car, which may have made it more likely that Plaintiff had also caused another form of harm to Officer Stoll.

[47] The record suggests that Deputy Remington went to the house of Plaintiff's neighbor during this time, seemingly to talk about the lighting issue that gave rise to the call for service in the first place, but where Deputy Remington went is immaterial.

[48] Plaintiff cannot dispute the existence of a photo that shows a cut. He also attempts to dispute this fact by providing an alternate account proffered by his daughter about how Officer Stoll might have received the cut, but that does not undermine the existence of the abrasion, and at best provides an alternate explanation of how it occurred. Plaintiff has supplied no evidence that his daughter told Deputy Remington or any other individual about how she believed Officer Stoll may have received the cut.

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk NP

Plaintiff's primary response to all this undisputed evidence is that Deputy Remington failed to conduct an adequate investigation by not getting his side of the story while at the scene or not believing his denials in his subsequent interview back at the Perris Sheriff's Station. (See Opposition to County MSJ at 10-13.)   To be sure, the Court would agree with Plaintiff that there is a genuine dispute of material fact as to the existence of probable cause if Mr. Young's denials could have *negated* the probable cause that would otherwise exist.  That is so whether the Court evaluates the existence of probable cause, or as discussed below, whether Deputy Remington is entitled to qualified immunity.  See Broam v. Bogan, 320 F.3d 1023, 1032 (9th Cir. 2003) ("An officer is not entitled to a qualified immunity defense . . . where exculpatory evidence is ignored that would negate a finding of probable cause."); Yousefian v. City of Glendale, 779 F.3d 1010, 1014 (9th Cir. 2010) ("Certainly, an officer may not ignore exculpatory evidence that would negate a finding of probable cause.") (quotation marks omitted); Kuehl v. Burtis, 173 F.3d 646, 651 (8th Cir. 1999) (denying qualified immunity where an officer "plainly ignored exculpatory evidence" and did not satisfy his "duty to conduct a reasonable investigation"); Sevigny v. Dicksey, 846 F.2d 953, 957-58 (4th Cir. 1988) (holding that an officer who failed to "avail himself of readily available information" which could have exculpated the plaintiff was not entitled to qualified immunity for unlawful arrest).  While in a sufficiently close case an officer behaves unreasonably when he fails to consider an individual's explanation of innocence before making an arrest, this is not such a case.  Indeed, it is not just a "he said, he said" that would have required weighing Officer Stoll's allegations against Plaintiff's prior to making a formal arrest, because the corroborating evidence cited above strongly tipped the scales against Mr. Young.  It has long been the law that a suspect's statement of innocence does not, by itself, negate probable cause.  See Motley v. Parks, 432 F.3d 1072, 1082 (9th Cir. 2005), overruled on other grounds by United States v. King, 687 F.3d 1189 (9th Cir. 2012) ("Motley's statement that Jamerson did not live at that address, coming from a less-than-disinterested source, did not undermine the information the officers previously had received . . . ."); Wesby, 138 S. Ct. at 588 (explaining that, despite a suspect's assertion of innocence, a "reasonable officer could conclude—considering all of the [aforementioned] surrounding circumstances, including the plausibility of the explanation itself—that there was a substantial chance" that he had committed an offense, for "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."); United States v. Sarras, 575 F.3d 1191, 1219 (11th Cir. 2009) ("A self-serving denial, on its own, does not defeat probable cause.").

To negate "information establishing probable cause," an officer must be "presented with convincing evidence that the information they had relied upon was incorrect."  United States v. Ped, 943 F.3d 427, 432 (9th Cir. 2019) (citation and quotations omitted).  Plaintiff points to two pieces of evidence: (1) his own denials; and (2) the video of the altercation. (See Opposition to County MSJ at 12.)  As the Court has already explained, the video is ambiguous, although it may tend to cast doubt on Officer Stoll's account.  But there is a bigger problem with the argument as to the video: the undisputed facts show that Deputy Remington was not aware of the existence of the video until he was able to conduct an interview with Plaintiff back at the station.  And as soon as Plaintiff did make him aware of the video, Deputy Remington took every reasonable effort to acquire it, including acquiring Plaintiff's wife's phone number and making

arrangements with her to acquire the video from the house. Thereafter, Deputy Remington called Plaintiff's wife at least five times, but she ignored his calls, raising a strong inference that Plaintiff and his wife did not want County Defendants to acquire the video. That conclusion was reinforced by the fact that a Riverside County Sheriff's Deputy visited Plaintiff's home while Plaintiff was in custody, and Plaintiff's sister did not give him the video. Thereafter, following Plaintiff's release from jail, another Deputy asked Plaintiff's wife for the video, and she refused to give it to him. (See County MSJ GDMF ¶¶ 45-47, 50; Young Declaration ¶¶ 10, 16; Dkt. No. 131-14, Ex. M; Remington Dep. 108:1-20.) Plaintiff cannot have it both ways: if he claims the video proves his innocence, he and his family cannot have made it unreasonably difficult, and arguably impossible, for law enforcement to secure it. As to Deputy Remington's decision not to believe his denials, Deputy Remington had a very cogent explanation for why he had sufficient cause to believe Officer Stoll notwithstanding Plaintiff's denial that he hit him. Deputy Remington found Officer Stoll's story more likely because it did not make sense to him why a code enforcement officer would punch Plaintiff and pepper spray him without any provocation. To the contrary, he thought it more likely that Plaintiff had punched Officer Stoll in the face because that would have led Officer Stoll to use force in return, while the cut on Officer Stoll's face (which Deputy Remington did not observe on Officer Stoll's face prior to the altercation) must have come from somewhere. (See Dkt. No. 131-14, Ex. M; County MSJ GDMF ¶ 72.) In sum, the evidence shows that Deputy Remington "made a reasonable investigation under the circumstance before he arrested" Plaintiff. Peng, 335 F.3d at 979.

Setting aside the above analysis, even if there is insufficient evidence to demonstrate probable cause, the Court would conclude that Deputy Remington was entitled to qualified immunity as to Plaintiff's Section 1983 claim for false arrest. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). An officer will be denied qualified immunity if (1) taking the alleged facts in the light most favorable to the party asserting injury, the officer committed a constitutional violation, and (2) the officer's specific conduct violated "clearly established" federal law at the time of the alleged misconduct such that a reasonable officer would have understood the conduct to be unlawful. Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011) (citing Saucier v. Katz, 533 U.S. 194, 201-02 (2001)). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991). Put another way, "[e]ven if the arrest was made without a warrant and without probable cause, however, the officer may still be immune from suit if it was objectively reasonable for him to *believe* that he had probable cause." Rosenbaum v. Washoe County, 663 F.3d 1071, 1078 (9th Cir. 2011). "[T]he question in determining whether qualified immunity applies is whether all reasonable officers would agree that there was no probable cause" to make the arrest. Id. at 1078. Even if the Court were to conclude that Deputy Remington should have gathered more evidence before making the arrest, the Court cannot say that the lack of evidence would be so obvious that all reasonable officers would agree that an arrest was inappropriate. One way that Plaintiff could have demonstrated the obviousness of the absence of probable cause is, of course, to point to an authority that is sufficiently analogous to

the facts at hand that would have given Deputy Remington and other officers fair notice that an arrest was inappropriate in this situation. But Plaintiff points to no clearly established law, let alone precedent that is "particularized" to the facts of the case. White v. Pauly, 137 S. Ct. 548, 552 (2017). A constitutional right is clearly established for the purposes of qualified immunity if "existing precedent . . . placed the statutory or constitutional question confronted by the official beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). The Court cannot hold that all reasonable officers under the circumstances presented here would have concluded that arresting Plaintiff for battery was inappropriate. Thus Deputy Remington would be entitled to qualified immunity even if the Court had not also held above that probable cause existed, not just that it was reasonable for Deputy Remington to believe that probable cause existed.

County Defendants also argue that there is no basis to bring a claim against anyone other than Deputy Remington for false arrest. (See County MSJ at 10-11.) Now that Officer Zalunardo has been dismissed, the remaining County employee sued for false arrest or false imprisonment is Officer Johnson. As noted above, it is undisputed that Officer Johnson did not arrest Plaintiff; Deputy Remington did. Officer Johnson simply transported Plaintiff from the Perris Sheriff's Station after he was arrested to the hospital, and thereafter from the hospital to jail. Plaintiff has not responded to the argument, conceding the issue. See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[F]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." (citation and quotations omitted); accord Jenkins v. County of Riverside, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (holding that a plaintiff abandoned claims by not raising them in opposition to motion for summary judgment). But even if Plaintiff had not conceded the point by failing to respond to the argument, the Court would have little trouble holding that there is no basis for liability for false arrest against an officer who inarguably did not *arrest* Mr. Young, but rather transported him afterwards. See Jenkins v. Keating, 147 F.3d 577, 583-84 (7th Cir. 1998) (explaining that an officer who does not arrest the plaintiff is not liable for false arrest); Williams v. City of McComb, 2015 WL 5712758, at *2 (S.D. Miss. Sept. 29, 2015) ("Williams . . . concedes that he did not encounter Officer Jackson until he was transported to the police department for booking. It is undisputed therefore that Defendant Jackson was not present at the scene and had no personal involvement in his arrest. . . . Accordingly, Defendant Jackson is entitled to summary judgment on Plaintiff's false arrests claims for this reason alone.").

The County is no longer a defendant in Plaintiff's second cause of action for false arrest arising under Section 1983, while the basis for liability against the County on all of Plaintiff's state law claims asserting in whole or in part that he was falsely arrested or imprisoned is respondeat superior. (See TAC.) Absent a basis for liability against a County employee, the County is not liable. See Cal Gov. Code §§ 815, 815.2. For the reasons above, the Court GRANTS the County MSJ as to all of Plaintiff's claims for false arrest or false imprisonment against the County or its

employees, namely his second, seventh, eighth, ninth and tenth causes of action.[49]  As discussed below, there are alternate bases for liability asserted in Plaintiff's eighth, ninth and tenth causes of action, so the Court evaluates those claims before granting summary judgment for County Defendants.[50]

### 4. False Reports Claims: Second, Ninth and Tenth Causes of Action

Plaintiff alleges that Deputy Remington, and perhaps others, prepared false reports, which forms the partial basis for liability in Plaintiff's second, ninth, and tenth causes of action. (See TAC.)  County Defendants argue that there is no clearly established right to accurate reports, Deputy Remington's report was accurate, and Officer Johnson did not prepare a report, so he is not a proper defendant for such a cause of action. (See County MSJ at 11-12.)

The Court begins with the latter contention.  It is undisputed that Officer Johnson did not prepare any written reports concerning Plaintiff.  The only written documents he prepared were logs which stated the start and end times of the transportation of Plaintiff and the locations to which he and Officer Zalunardo transported him. (County SUF ¶ 17.)  In a last-ditch effort to manufacture a claim against Officer Johnson, Plaintiff claims there is a "dispute as to whether Johnson made false and misleading *verbal* reports to medical staff at the hospital . . . resulting in inadequate medical care and/or criminal charges." (Opposition to County MSJ at 14.)  Plaintiff never provides any basis to believe that anything Officer Johnson said at the hospital was false, citing only an error in his medical records regarding a medical professional's belief that Plaintiff was involved in a car chase. (See id. at 14.)  As noted above, the medical records never attribute that statement to Officer Johnson.  But even if they could be attributed to Officer Johnson, it defies reason to suggest that such a statement would have resulted in "criminal charges" against Plaintiff.  There is not a single fact in the record that remotely suggests anything Officer Johnson said or did at the hospital made it more or less likely that Plaintiff would be criminally prosecuted, or that any statement he made or fact he gathered there was used in criminal proceedings.  More fundamentally, Plaintiff's newfound theory of "verbal reports" is never once mentioned in the

---

[49] The Court finds it self-evident as to why Plaintiff has no cause of action for, say, negligence, predicated on a false arrest, if there is no underlying claim for false arrest.  But, to state the obvious, "[t]he elements of a negligence cause of action are: (1) a legal duty to use due care; (2) a breach of that duty; (3) the breach was the proximate or legal cause of the resulting injury; and (4) actual loss or damage resulting from the breach of the duty of care."  Brown v. Ransweiler, 171 Cal. App. 4th 516, 534 (2009).  Assuming County Defendants had a legal duty to use due care in not arresting Plaintiff without probable cause, they did not breach that duty because Deputy Remington had probable cause to effectuate the arrest.  Absent an underlying violation of federal or state law, Plaintiff cannot bring a Bane Act claim predicated on false arrest or false imprisonment.  And there is likewise no basis for an intentional infliction of emotional distress claim based on a false arrest: an officer-defendant does not commit the tort of infliction of emotional address when he makes a valid arrest.

[50] The Court evaluates City Defendants' arguments in the City MSJ regarding Plaintiff's seventh and ninth causes of action separately, below.

---

TAC, while there is not a single factual allegation therein that can remotely be construed as affording Defendants with fair notice of such a theory of relief. "Where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court." Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008). "[T]he necessary factual averments are required with respect to each material element of the underlying legal theory. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." Wasco Prod., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) (citation omitted). Plaintiff's new theory of "verbal reports" was never mentioned in the TAC, and any facts he contends now support that theory are outside the pleadings and cannot be raised for the first time in opposition to a motion for summary judgment. The Court finds no basis for "false report" liability against Officer Johnson.

The Court agrees with Plaintiff that there may be a genuine dispute as to whether Deputy Remington's report was wholly accurate, although not for the reasons he cites in the Opposition to County MSJ. Plaintiff contends that Deputy Remington's report was inaccurate or misleading because (1) he failed to mention Plaintiff's initial denials that he had committed a crime when Deputy Remington returned to the scene; and (2) failed to mention the existence of a potentially exculpatory video. (See Opposition to County MSJ at 14-15.)[51] The Court is not persuaded by either argument. It is undisputed that Deputy Remington's report contains a lengthy recitation of Plaintiff's side of the story following his purported waiver of his Miranda rights, including full denials that he had done nothing wrong and that Officer Stoll had attacked him. To the extent Plaintiff claims that the report is misleading because Deputy Remington failed to include within it statements that Mr. Young made at the scene, there is no misleading effect because the only reasonable interpretation of the report is that Deputy Remington believed Plaintiff committed the offenses notwithstanding Mr. Young's robust denials. Moreover, there is a twisted logic to Plaintiff's argument: on the one hand, he says that Deputy Remington and the County are liable for referencing statements he claims were un-Mirandized, i.e., any he would have made at the scene. On the other hand, he says that Deputy Remington and the County are liable if Deputy Remington omitted his on-scene denial from his report. The Court is not persuaded by this "heads I win, tails you lose" litigation strategy. As to the video, the Court has already explained above why it is Plaintiff's fault that the County did not include the video in a report. Deputy Remington tried very hard to get the video. Plaintiff and his family prevented him and other Deputies from acquiring it. Plaintiff cannot deny law enforcement the video and then turn around and sue them on the basis that the "potentially exculpatory video" was not included in the report.

---

[51] Notably, Plaintiff does not contend that Deputy Remington should have included his explanation that he failed to see Officer Stoll's vehicle in his report. The reason is rather obvious: he never made that excuse in his interview with Deputy Remington at the Sheriff's Station. (See Dkt. No. 131-14, Ex. N.) That is a new argument he has been making since the litigation began.

CIVIL MINUTES—GENERAL                    Initials of Deputy Clerk NP

That said, while it is doubtful that the Court should credit the argument because Plaintiff does not explicitly raise it in the argument section of his briefing, it is possible to conclude that Deputy Remington's report failed to accurately convey the sentiments of Plaintiff's neighbor, Linda Lewis. Deputy Remington's report states that Ms. Lewis did not know whether the collision was intentional or not but that Mr. Young had been upset about a situation with another neighbor. (See Response to County MSJ GDMF ¶ 77.) In Deputy Remington's interview with Ms. Lewis, she initially states that she did not believe Plaintiff had intentionally hit Officer Stoll's vehicle because it slid. When Deputy Remington thereafter tells Ms. Lewis that he believed it must have been intentional, she does not explicitly disagree with him. (See id.; Dkt. No. 131-12, Ex. L; City MSJ GDMF ¶ 66.) Thus, it may be reasonable to conclude that Deputy Remington did not accurately report a potentially exculpatory statement made by Ms. Lewis. Even so, that statement is rather ambiguous, and almost certainly immaterial, since Ms. Lewis was essentially speculating as to Plaintiff's *mens rea*, while she clearly held no strong position on the issue because she did not maintain it when Deputy Remington expressed doubt about it in light of the other evidence he had observed.

Ultimately, the Court still finds that County Defendants are entitled to judgment as a matter of law on all of Plaintiff's false report claims because a single inaccuracy in a police report, standing alone, is not a basis for legal liability. The "filing of a false police report, without more, does not amount to a constitutional violation." Garcia v. City & County of Honolulu, 2020 WL 5604034, at *18 (D. Haw. Sept. 18, 2020). "District courts in the Ninth Circuit have repeatedly held as much." Id. (collecting cases). As another district court has explained on analogous facts with regard to a Section 1983 claim:

> Without evidence to support the assertion that DiPaola [a police officer] knowingly created a false report, Royster has shown no constitutional violation. . . . [Moreover,] Royster has not shown that the mere filing of a false, i.e., inaccurate, police report gives rise to a violation of a clearly established right. Put another way, there is no clearly established constitutional right to have accurate police reports, and Royster cites no case so holding. Quite to the contrary, in the few reported opinions addressing § 1983 claims arising out of false police reports, federal courts have reiterated that there is no clearly established constitutional right to accurate police reports.

Royster v. Schluderberg, 2013 WL 781599, at *2 (D. Md. Feb. 28, 2013) (collecting cases). Plaintiff has submitted no evidence that Deputy Remington knowingly crafted a false report, or evidence from which a reasonable jury could infer such a finding. But even if Plaintiff could show that Deputy Remington violated his constitutional rights by writing an inaccurate report, there is no clearly established law that would afford Deputy Remington with fair notice of such a cause of action, entitling him to qualified immunity under Section 1983. See id. (holding that the officer was entitled to qualified immunity); Garcia, 2020 WL 5604034, at *20 (holding that officers were entitled to qualified immunity on the basis of a false report claim).

An even more fundamental problem with Plaintiff's false report theory is that, as the Seventh Circuit has observed, it is "nothing more than a recast of his Fourth Amendment false arrest claim . . in the guise of a substantive (rather than procedural) due process violation." McCann v. Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003). And to the extent Plaintiff claims that he was prosecuted on the basis of faulty or misleading evidence in a police report, "his claim is, in essence, one for malicious prosecution, rather than a due process violation." Id. By asserting a theory as he has done here, Plaintiff has made an impermissible "end run" around precedent that almost certainly would have precluded his claims "by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment." Id. As the Court has already explained above, even if Plaintiff could show that Deputy Remington's report failed to include a potentially exculpatory statement, he has no viable Fourth Amendment claim for false arrest because that report still contained a sufficient basis for probable cause. See Lacey, 693 F.3d at 918 (holding that a plaintiff must demonstrate the absence of probable cause to prevail on a claim for unlawful arrest in violation of the Fourth Amendment); Velazquez, 793 F.3d at 1019 (same); Cabrera, 159 F.3d at 380 (same). There is obviously no basis for substantive due process liability on the basis of a police report that contains an omission but still demonstrates probable cause, because "no substantive due process right exists under the Fourteenth Amendment to be free from prosecution *without* probable cause." Awabdy v. City of Adelanto, 368 F.3d 1062, 1069 (9th Cir. 2004) (emphasis added). If Plaintiff had brought a malicious prosecution claim, he would also have had to show the absence of probable cause, which he cannot do. See Smith v. Almada, 640 F.3d 931, 938 (9th Cir. 2011) ("To maintain a § 1983 action for malicious prosecution, a plaintiff must show that 'the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her [a] specific constitutional right.'") (quoting Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995)); see also Lassiter v. City of Bremerton, 556 F.3d 1049, 1054-55 (9th Cir. 2009) ( "[P]robable cause is an absolute defense to malicious prosecution."). Moreover, even if Plaintiff could have chosen to assert a malicious prosecution theory against Deputy Remington and others, nothing in the TAC would have afforded Defendants with fair notice of such a claim, and the Court would find it inappropriate to allow Plaintiff to raise such a wholly new theory now. See Navajo Nation, 535 F.3d at 1080.

Plaintiff attempts to get around the absence of any clear authority in his favor by arguing that there is a "clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001). In Devereaux, the Ninth Circuit reasoned that "[u]nder Pyle v. Kansas, 317 U.S. 213, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While Pyle does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right." Id. at 1075. But there is a world of difference between evidence that is "deliberately fabricated by the government" and the "knowing use of . . . perjured testimony" by the government and the circumstances present here. Plaintiff has cited no evidence that Deputy Remington *fabricated*

evidence against him for use in criminal proceedings. At worst, Deputy Remington failed to include a potentially exculpatory statement in a report that still contained sufficient evidence of probable cause to support the arrest and prosecution of Mr. Young. Moreover, in <u>Deveraux</u> itself, the Ninth Circuit held that a plaintiff's fabrication-of-evidence theory was insufficient to survive summary judgment in the context of allegations that officers had intentionally obtained false statements from alleged child sex abuse victims. See <u>id.</u> at 1076. The panel held that, "in order to support such a claim, Devereaux must, at a minimum, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." <u>Id.</u> The plaintiff failed to adduce evidence of either contention. See <u>id.</u> To the extent that analysis is applicable here, Plaintiff has failed to make the required showing: he does not and likely cannot produce any evidence that Deputy Remington or others continued an investigation when they knew or should have known that he was *innocent*, and they certainly did not use any coercive investigative techniques.

Plaintiff has not cited any cases arising under state law causes of action that suggest there is an actionable basis for liability merely on the basis of a potential misstatement in a police report. In the absence of any cited authority that would warrant a departure from the above analysis arising under federal law, the Court is not inclined to find that Plaintiff can maintain a negligence cause of action on the basis of an omission in police report, at least under the circumstances here. Assuming without deciding that Plaintiff could show a breach of a duty of due care in writing a police report that did not fully convey what a witness said to the officer, Plaintiff has failed to adduce evidence that that breach was the proximate or legal cause of any injury he suffered, which is required to demonstrate negligence. See <u>Hayes v. City of San Diego</u>, 57 Cal. 4th 622, 629 (2013). Because Deputy Remington's report was accurate in virtually every material respect and contained a clear statement of probable cause, regardless of whether Plaintiff's neighbor's statement had been accurately conveyed, it is virtually certain that nothing would have changed in the subsequent proceedings against Mr. Young whether or not Ms. Lewis's sentiments were quoted directly. As the Court has already explained above, her position on Plaintiff's *mens rea* as to the alleged vandalism was ambiguous and speculative, and immaterial to any finding that a law enforcement officer or prosecutor could make as to the decision to prosecute Plaintiff. Moreover, the case against Plaintiff was dismissed many months later. There is simply no causal nexus between any misstatement in Deputy Remington's report and any harm suffered by Plaintiff. Cf. <u>Bronner v. S.F. Superior Ct.</u>, 2010 WL 2650500, at *5 (N.D. Cal. July 1, 2010) ("Although plaintiff identifies the allegedly false and/or inaccurate police report he complains of, plaintiff has not alleged that the report proximately caused plaintiff any constitutional deprivation."). For the same reasons, as well as the additional reasons discussed below with regard to Plaintiff's Bane Act claim, there is no basis for liability under that cause of action either, at least to the extent it is based on a purportedly inaccurate report.

For these reasons, there is no basis for liability against Deputy Remington or Officer Johnson with regard to Plaintiff's false report claims, and absent a liable employee, the County is not liable in respondeat superior for Mr. Young's state law claims. The Court GRANTS the

County MSJ as to Plaintiff's second, ninth and tenth causes of actions as to County Defendants
to the extent they are predicated on a false or inaccurate report.

### 5. Denial of Medical Care Claims: Third, Eighth, Ninth and Tenth Causes of Action

County Defendants argue that there is no basis for liability against Deputy Remington,
Officer Johnson or the County in respondeat superior for any of Plaintiff's medical care claims.
(County MSJ at 13.)  The TAC alleges four causes of action predicated in whole or in part on a
denial of medical care: Plaintiff's third (denial of medical care pursuant to Section 1983), eighth
(intentional infliction of emotional distress), ninth (negligence), and tenth (Bane Act) causes of
action.  (See TAC.)  As relevant to the County MSJ, Deputy Remington and Officer Johnson are
Defendants in the third cause of action, while Deputy Remington, Officer Johnson and the
County itself are Defendants in the eighth, ninth, and tenth claims.  (See id.)

The primary factual basis for Plaintiff's denial of medical care claims are the acts prior to
his incarceration for one night in jail.  As the Court held above, the Court need not reach the
merits of Mr. Young's state law claims regarding pre-jail medical care because the governmental
claim he filed indisputably failed to mention such conduct in any way, depriving Defendants of
fair notice of the nature of those actions.  The Court also finds no basis for a medical care claim
arising under federal law or during Plaintiff's short period of incarceration.

Plaintiff's Section 1983 claim appears to allege violations of the Fourth, Eighth and
Fourteenth Amendments.  (See TAC.)  To the Court's knowledge, the only potentially
cognizable claim for medical care arising under the Fourth Amendment would be a failure to
summon emergency aid, which is a form of excessive force.  See Tatum v. City & County of San
Francisco, 441 F.3d 1090, 1098 (9th Cir. 2006).  However, Plaintiff explicitly disavows a failure
to summon emergency medical aid theory in the Opposition to County MSJ, so the Court will not
evaluate one.  (See Opposition to County MSJ at 15-16.)  Plaintiff also appears to have abandoned
any claim under the Eighth Amendment, because he argues that only the Fourteenth
Amendment applies to his constitutional denial of medical care claim.  (See id. at 15-16.)

There is a relative dearth of authority applying the Fourteenth Amendment's guarantee
of adequate medical care to the *arrestee* context, as almost all of the relevant authorities arise in
the context of claims asserted by prisoners incarcerated in jails or prisons.  The parties appear to
assume that the same familiar constitutional standards would apply to Plaintiff's medical care
claims prior to his incarceration, so the Court will proceed on that basis as well.  Under the Due
Process Clause of the Fourteenth Amendment, a pretrial detainee in the custody of state of
officials has a constitutional right to adequate medical treatment.  Sandoval v. County of San
Diego, 985 F.3d 657, 667 (9th Cir. 2021).  A potential violation of this right is "evaluated under
an objective deliberate indifference standard." Gordon v. County of Orange, 888 F.3d 1118,
1124-25 (9th Cir. 2018).  "Based thereon, the elements of a pretrial detainee's medical care claim
against an individual defendant under the due process clause of the Fourteenth Amendment are:
(i) the defendant made an intentional decision with respect to the conditions under which the
plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious

harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." Id. at 1125.  As to the third element, a defendant's conduct must be "objectively unreasonable," while the "mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment."  Id. (internal quotations and citations omitted).  "Thus, the plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'"  Id. at 1225 (citation omitted).  Moreover, a mere delay in affording a plaintiff necessary medical care is insufficient to demonstrate deliberate indifference; a plaintiff must demonstrate that the delay resulted in harm.  See Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).

Plaintiff's claim against Deputy Remington alleges that he (1) did not allow him to wash the pepper spray off with a hose; and (2) placed him in the back of a patrol car and took him to the Perris Sheriff's Station for questioning, rather than directly to the hospital.  Although Plaintiff raises other contentions in the Opposition to County MSJ, they are misleading, mischaracterizations of the record, or contentions made without any evidentiary support.  As noted above, there is no evidence that Deputy Remington "ignored Plaintiff's pleas for medical care."  (Opposition to County MSJ at 17.)  There is no evidence in the record that Plaintiff asked Deputy Remington to be taken directly to the hospital.  Indeed, the undisputed evidence shows that Deputy Remington told Mr. Young his plan to take him back to the station and then to the hospital, while Plaintiff never once objected or expressed any need for immediate or emergency medical attention that could not wait until he was questioned at the station.  (See City SUF ¶¶ 29-30; County MSJ GDMF ¶¶ 54, 59, 78, 80; Dkt. No. 131-13, Ex. M.)  There is no basis in the record to conclude that, with the exception of being in pain from pepper spray, Plaintiff was suffering from an injury that demanded emergency medical attention, nor is there any evidence to show that Deputy Remington was aware of such an injury.  Indeed, once Plaintiff was taken to the hospital, the medical records unequivocally demonstrate that medical personnel found no serious injuries other than the effects of pepper spray.  As to the potential effects of being hit by Officer Stoll, Plaintiff denied loss of consciousness to medical professionals, there is no evidence he suffered head trauma, and the CT scans were negative.  (See Dkt. No. 106 Ex. 8 at 12; County SUF ¶¶ 24-25.)  As this evidence shows, there is no basis to find any of the elements of a deliberate indifference claim against Deputy Remington: there was no intentional decision that put Mr. Young at substantial risk of serious harm, while even if hindsight would show that Deputy Remington could have done more for Plaintiff, he did not act with reckless disregard.  Indeed, had Plaintiff asked Deputy Remington to be taken straight to the hospital because he was suffering from head trauma or some other serious injury, and had Deputy Remington categorically refused so he could interrogate Mr. Young at the station, that might constitute deliberate indifference.  But those are not the facts presented here.

As the Court has also noted above, it is disputed whether Plaintiff asked Deputy Remington if he could use the hose to wash off his face and whether Deputy Remington refused to allow him to.  Plaintiffs say this occurred; Defendants deny that any such statements were

made.  (See County MSJ GDMF ¶ 92; Response to County MSJ GDMF ¶ 92.)  Even if such a
denial could constitute a constitutional violation, the Court would find that Deputy Remington is
entitled to qualified immunity on the basis that there is no clearly established right under the
circumstances present here.  It is undisputed that Plaintiff was given at least one water bottle to
wash off his face.  Whether a right is clearly established turns on whether it is "sufficiently
definite that any reasonable official in the defendant's shoes would have understood he was
violating it."  Nicholson v. City of Los Angeles, 935 F.3d 685, 695 (9th Cir. 2019) (quoting Kisela
v. Hughes, 138 S. Ct. 1148, 1153 (2018)).  Under the second prong of the qualified immunity
analysis, "[w]e begin our inquiry into whether this constitutional violation was clearly established
by defining the law at issue in a concrete, particularized manner."  Shafer v. County of Santa
Barbara, 868 F.3d 1110, 1117 (9th Cir. 2017).   A plaintiff bears the burden of showing that the
rights allegedly violated were clearly established.  Id. at 1118.  To show that a right was clearly
established, the plaintiff must demonstrate that, at the time of the alleged violation, the state of
the law gave fair warning that the relevant conduct was unconstitutional.  See Ballentine
v. Tucker, 28 F.4th 54, 64 (9th Cir. 2022).  "In the Ninth Circuit, we begin our inquiry by
looking to binding precedent . . . .  If the right is clearly established by decisional authority of the
Supreme Court or this Circuit, our inquiry should come to an end.  On the other hand, when
'there are relatively few cases on point, and none of them are binding,' we may inquire whether
the Ninth Circuit or Supreme Court, at the time the out-of-circuit opinions were rendered, would
have reached the same results . . ..  Thus, in the absence of binding precedent, we 'look to
whatever decisional law is available to ascertain whether the law is clearly established' for
qualified immunity purposes, including decisions of state courts, other circuits, and district
courts."  Boyd v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004) (citations omitted).  Because
the Court cannot frame the right at issue at a high level of generality, the right Plaintiff seeks to
uphold under the Constitution is essentially the right to the immediate use of pressurized water
to wash off pepper spray.[52]  Plaintiff has identified no remotely analogous authority that would
place the existence of this right beyond debate, or that would demonstrate to all reasonable
officers that they are required to allow a suspect to use water in this way.  As such, Deputy
Remington is clearly entitled to qualified immunity as to Plaintiff's third cause of action.

Likewise, there is no basis for liability against Officer Johnson.  It is undisputed that
Officer Johnson transported Plaintiff from the Perris Station to the hospital, accompanied
Plaintiff while at the hospital, and transported Plaintiff from the hospital to the jail to be booked.
The TAC generally alleges that Officer Johnson denied Plaintiff medical care by preventing
medical personnel from doing their jobs or prevented him from receiving pain medication.
(See TAC ¶¶ 56-60, 87.)  The Court has summarized the undisputed facts regarding Officer
Johnson's conduct in great detail above.  In sum, Plaintiff has supplied no admissible evidence
that Officer Johnson did anything to deny him medical care.  His sole contention is that Officer
Johnson placed him in a corner, where he was unable to hear the conversations between Officer

---

[52] The Court has serious doubts that Plaintiff's proposed remedy would even have helped
the situation much, given that pepper spray generally cannot be washed off the skin with water
alone.  But it need not make a determination as to the efficacy of Plaintiff's solution to reach the
legal conclusion here.

Johnson and medical personnel.  While he may believe that Officer Johnson said something that led to him receiving what was, in his view, inadequate care, he has nothing but speculation and conjecture to show for it, for it is undisputed that Plaintiff acknowledges he was unable to hear what Officer Johnson said while at the hospital.  There is also nothing in the record that remotely suggests the care Plaintiff received at the hospital was inadequate: the medical records clearly show that medical professionals diagnosed his symptoms, ran tests (including CT scans), prescribed him medication for his pain, informed him of a release plan, and obtained Plaintiff's consent to that plan.  There is also nothing in the record that suggests that the hospital actually intended to give him pain medication that he could take at the jail; to the contrary, the records clearly show that Plaintiff was informed that he was being given a *prescription* for medication, and he indicated he understood.  It is also undisputed that Officer Johnson followed County policy by not transporting medication into the jail for Plaintiff.  To the contrary, he transported all relevant documents from the hospital, including the prescription.  This makes sense, because jails tightly control the distribution of any medicines or pharmaceutical products, and do not generally allow medication to be brought directly into the jail.  Rather, a prescription is given to jail medical personnel, who then distribute medications to prisoners from their own inventory.  (See Dkt. No. 106 Ex. 8; County MSJ GDMF ¶¶ 98, 104; County SUF ¶¶ 30-31; County SUF ¶ 20; County MSJ GDMF ¶ 98; Young Dep. 80-88.)  The Court cannot discern any basis for liability against Officer Johnson under these facts.  Moreover, even if it could, Officer Johnson would be entitled to qualified immunity for similar reasons to Deputy Remington: Plaintiff has identified no analogous authority that would afford Officer Johnson fair notice of the unconstitutionality of the conduct at issue here.

It is also clear that Plaintiff has no real claim for denial of medical care while incarcerated for a day, for he raises no real argument on the point in the Opposition to County MSJ.  (See Opposition to County MSJ at 15-19.)  The only possible allegation Plaintiff has raised is that he was denied pain medication.  But the undisputed evidence shows that Plaintiff was given Tylenol when he arrived at the jail. (County SUF ¶ 32.)  Plaintiff was released from jail the following morning, and at that point he was free to seek any medication he wanted.  (Id. ¶ 33.)  There is no factual basis to conclude that Plaintiff was denied adequate medical care while incarcerated.

As to Plaintiff's claims asserting a denial of medical care under state law arising out of conduct prior to his incarceration, they are barred by Mr. Young's failure to raise them prior to the initiation of litigation in his governmental claim for damages.  Moreover, County Defendants have raised specific arguments why these claims fail.  (See County MSJ at 14-15.)  Plaintiff has not responded to them, conceding the issues.  (See Opposition to County MSJ at 15-19.)  As to Plaintiff's contentions regarding inadequate medical care while incarcerated, those claims fail under state law for the same reasons as they do under federal law: there is simply no basis to find that Plaintiff was denied adequate medical care while in jail.

For the reasons above, there is no basis for liability against Deputy Remington or Officer Johnson with regard to Plaintiff's medical care claims.  Because there is no employee liable for damages, the County is not liable under a theory of vicarious liability.  The Court GRANTS the

County MSJ as to Plaintiff's third cause of action, and as to Plaintiff's eighth, ninth and tenth causes of action to the extent they are predicated on a denial of medical care.

### 6. Eighth Cause of Action: Intentional Infliction of Emotional Distress Against the County and County Employees

County Defendants move for summary judgment on Plaintiff's eighth cause of action for intentional infliction of emotional distress ("IIED"), which is asserted against Deputy Remington, Officer Johnson, and the County in respondeat superior.  (See County MSJ at 20-21; TAC.)

To prevail on a claim for IIED, a plaintiff must establish "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Hughes v. Pair, 46 Cal. 4th 1035, 1050 (2009) (citations omitted).  Conduct is "outrageous" when it is so "extreme as to exceed all bounds of that usually tolerated in a civilized community." Id. at 1050-51.  The defendant's conduct must be "intended to inflict injury or engaged in with the realization that injury will result." Id. at 1051.

County Defendants move for summary judgment on the grounds that the claim is entirely derivative of the claims and theories raised above, and thus that the IIED cause of action fails for the same reasons.  (County MSJ at 20-21.)  Plaintiff acknowledges that this claim is "derivative" of his claims for false arrest and false imprisonment, false reports, the use of un-Mirandized statements, and the denial of adequate medical care.  (Opposition to County MSJ at 20-21.) Because all of the underlying factual and legal bases for this claim fail for the reasons above, so does Plaintiff's IIED cause of action, at least as to Deputy Remington, Officer Johnson, and the County under a theory of respondeat superior.  The TAC alludes to a basis for liability for IIED as to the County due to a failure to "take appropriate steps or enact appropriate measures designed to prevent" unspecified harms, which the Court construes as a vague and a conclusory attempt to suggest that the County is not just sued under a theory of respondeat superior.  (See TAC ¶ 121.)  County Defendants argue that there is no basis for liability against the County for failing to enact any policies or procedures related to an IIED claim.  (County MSJ at 20.) Plaintiff explicitly concedes that he raises only a respondeat theory under as to his eighth and ninth causes of action. (See Opposition to County MSJ at 19-20.)

The Court GRANTS the County MSJ as to Plaintiff's eighth cause of action against Deputy Remington, Officer Johnson and the County.

### 7. Ninth Cause of Action: Negligence Against the County and County Employees

Plaintiff's ninth cause of action for negligence is asserted against all remaining County Defendants, namely Deputy Remington, Officer Johnson, and the County.  (See County MSJ at 19-21.)  Although the TAC is somewhat ambiguous as to the basis for liability against the County

for negligence, it appears to suggest that the County is liable both for failing to train or supervise its employees and under a theory of respondeat superior. (See TAC ¶ 127.) County Defendants argue that they have no duty to provide training or supervision under the circumstances here. (County MSJ at 20.) As noted above, Plaintiff concedes that he brings only claims asserting a theory of respondeat superior under his negligence cause of action. (Opposition to County MSJ at 19-20.)

To prevail on a negligence claim, a plaintiff must establish: (1) the defendant had a duty to use due care, (2) the defendant breached that duty, and (3) that breach was the proximate or legal cause of the resulting injury. Hayes, 57 Cal. 4th at 629. As with regard to Plaintiff's IIED claim, County Defendants argue that Plaintiff's negligence claim fails because it is entirely derivative of the same inadequate theories assessed above. (County MSJ at 21.) Plaintiff concedes that his negligence claims are derivative of the above causes of action, asserting theories of false arrest, inadequate medical treatment, and preparation of false reports. (See Opposition to County MSJ at 22-23.) Because all of these theories fail for the reasons set forth above, Plaintiff's derivative cause of action for negligence fails as well. The Court GRANTS the County MSJ as to Plaintiff's ninth cause of action against all County Defendants.

### 8. Tenth Cause of Action: Bane Act Claims Against the County and County Employees

Plaintiff's tenth and final cause of action against Deputy Remington, Officer Johnson and the County arises under the Bane Act. (See TAC.) Like many of the claims evaluated above, Plaintiff's Bane Act cause of action as to County Defendants is entirely duplicative and derivative of his other claims, asserting a hodgepodge of the same theories: unlawful arrest, Miranda violations, inadequate medical care, and writing false reports. (See id. ¶ 137.)

The Bane Act provides a cause of action wherein "a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of" California. Cal. Civ. Code § 52.1(b). Essentially, it "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.'" Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1). County Defendants argue that Plaintiff's derivative Bane Act claim fails for the same reason that the underlying theories upon which it is based fail. (County MSJ at 22.) The Court agrees: because the Bane Act merely provides a procedural vehicle for asserting underlying violations of law, Plaintiff's Bane Act necessarily fails. Spicer v. City of Camarillo, 195 Cal. App. 4th 1423, 1429 (2011) ("There is no violation of Spicer's statutory or constitutional rights. Absent a violation, there is no basis for a claim pursuant to the Civil Rights Act of Civil Code section 52.1.").

There is one possible factual allegation that could be of relevance to Plaintiff's Bane Act claim that has not been addressed above: his assertion that various unnamed deputies drove by

his house, which he suggests made him feel intimidated. Nonetheless, that fact is not raised at all in conjunction with Plaintiff's Bane Act claim in the TAC, those deputies are unidentified and are not named as Defendants in this action, and there is no allegation in the TAC that Plaintiff attempts to assert a theory of respondeat superior against the County for the actions of unnamed deputies with regard to Mr. Young's Bane Act claim. (See TAC ¶¶ 135-141.) Indeed, the TAC makes specific allegations that form the basis of Plaintiff's Bane Act claim, and none of them concern deputies driving by his house. (See id.) The Court declines to consider such evidence, for they were not properly alleged in the TAC and County Defendants were deprived of fair notice that Plaintiff may later attempt to allege them as the basis for a Bane Act claim. See Navajo Nation, 535 F.3d at 1080; Wasco, 435 F.3d at 992. Even if the Court were to consider such evidence, they would not constitute a basis for a Bane Act claim, because the deputies indisputably would not threatened or committed acts of violence, which the California Courts of Appeal have consistently held is required under the Bane Act. See, e.g., Julian v. Mission Cmty. Hosp., 11 Cal. App. 5th 360, 395 (2017), as modified on denial of reh'g (May 23, 2017) ("The plaintiff must show 'the defendant interfered with or attempted to interfere with the plaintiff's legal right by threatening or committing violent acts.'") (citation omitted); Gabrielle A. v. County of Orange, 10 Cal. App. 5th 1268, 1290 (2017), as modified (Apr. 18, 2017) ("[T]o state a cause of action under section 52.1 there must first be violence or intimidation by threat of violence. . . Plaintiffs do not even allege violence, and therefore the Bane Act claim must fail.") (citation omitted); Doe v. State of California, 8 Cal. App. 5th 832, 842 (2017), disapproved of on other grounds by Leon v. County of Riverside, 14 Cal. 5th 910 (2023) ("To prevail on a cause of action under Civil Code section 52.1, the plaintiff must show that the defendant interfered with or attempted to interfere with the plaintiff's legal right by threatening or committing violent acts."). Further, the Ninth Circuit has endorsed California's model jury instruction for Bane Act claims, CACI 3066. See Reese v. County of Sacramento, 888 F.3d 1030, 1044 (9th Cir. 2018). That instruction reads, "Plaintiff] claims that [defendant] intentionally interfered with [or attempted to interfere with] [his/her] civil rights by threats, intimidation, or coercion. To establish this claim, [plaintiff] must prove all of the following: 1. That [defendant] acted violently against [plaintiff]/ [and][ plaintiff]'s property] [to prevent [him/her] from exercising [his/her] right [insert right]/to retaliate against [plaintiff] for having exercised [his/her] right [insert right];] 2. That [plaintiff] was harmed; and 3. That [defendant]'s conduct was a substantial factor in causing [plaintiff]'s harm." Id. at 1041 n.3 (quoting Judicial Council Of California Civil Jury Instruction 3066). That instruction clearly states that a plaintiff must demonstrate violence or a threat of violence. To be sure, while the Bane Act requires "a showing of the defendant's specific intent to violate the plaintiff's constitutional rights," Rodriguez v. County of Los Angeles, 891 F.3d 776, 802 (9th Cir. 2018), "the Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." Reese, 888 F.3d at 1045. But that does not eliminate a showing of violence or threats of violence. Indeed, the most common factual basis for a Bane Act claim is an excessive force claim, in which context the Ninth Circuit (following its view as to the most persuasive opinions of the California appellate courts) was asked to decide whether the "threat, intimidation or coercion" element must be "transactionally independent." See Reese, 888 F.3d at 1042-44. Likewise, the case that the Ninth Circuit has followed, Cornell v. City & County of San Francisco, 17 Cal. App. 5th 766 (2017), as modified (Nov. 17, 2017), was a case in which

officers pointed a gun at the plaintiff.  See id. at 793 ("Cornell's theory was that Officer Brandt
and Sergeant Gin committed an assault by pointing a gun at him, putting him in fear of being
shot.  In support of this theory, he presented evidence that the gun-pointing by both officers in a
low-threat level situation violated the San Francisco Police Department's policy on the use of
deadly force and officer training standards for handling weapons.").  But, virtually by definition,
in any excessive force case, the plaintiff has allegedly suffered violence or the threat of violence.
It is very clear that Plaintiff's excessive force claim against Officer Stoll is strong enough to go to
trial, for City Defendants have not even moved for summary judgment on that cause of action.
But Plaintiff has no excessive force claim against County Defendants.  For that reason, any
allegation regarding the deputies who purportedly drove by Plaintiff's house would not constitute
any Bane Act claim by itself.  And the absence of violence or a threat of violence is another,
independent reason why Plaintiff's Bane Act claim would fail as to his derivative theories as well:
none of them involve violence or a threat of violence, either.

The Court GRANTS the County MSJ as to Plaintiff's tenth cause of action against all
County Defendants.

## B.  City MSJ

### 1.  Seventh Cause of Action: False Arrest and False Imprisonment Against the City and Officer Stoll

Officer Stoll and the City move for summary judgment on Plaintiff's seventh cause of
action, which asserts a theory of false arrest and false imprisonment.  (City MSJ at 13-16.)
Although it is undisputed that Officer Stoll was acting in his capacity as a Code Enforcement
Officer on the day of the incident, City Defendants do not argue that Officer Stoll had authority
as an officer to detain or arrest Plaintiff.[53]  Instead, City Defendants argue that Officer Stoll had
"lawful privilege" to detain Mr. Young pending the arrival of Deputy Remington in his capacity
as a "private citizen.  (Id. at 13.)  Because Plaintiff also assumes that these legal standards apply,
the Court proceeds on that basis.

As the Court stated above, the torts of "false arrest" and "false imprisonment" asserted
here are essentially the same.  See Hamilton, 217 Cal. App. 3d at 843; Moore, 5 Cal. App. 3d at
737.  "The elements of a tortious claim of false imprisonment are: (1) the nonconsensual,
intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable
period of time, however brief."  Easton v. Sutter Coast Hosp., 80 Cal. App. 4th 485, 496 (2000).
Public entities like the City are vicariously liable for torts of false arrest or imprisonment
committed by their employees.  Sullivan v. County of Los Angeles, 12 Cal. 3d 710, 722 (1974).  In

---

[53] City Defendants do not explicitly explain why they claim Officer Stoll's authority was
equal to that of a private citizen, but it is likely that he lacked the authority of a peace officer to
make an arrest.  Cf. People v. Melchor, 237 Cal. App. 2d 685, 700 (Ct. App. 1965) (explaining
that "patrol special officers of the City and County of San Francisco are not peace officers . . .
and have only the powers of arrest which are afforded to private persons") (citations omitted).

California, private citizens have the authority to make a "citizen's arrest" of another civilian "(1) [f]or a public offense committed or attempted in his presence[;] (2) When the Person arrested has committed a felony, although not in his presence[;] (3) When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it." Cal. Penal Code § 837; see also Frazier v. Moffatt, 108 Cal. App. 2d 379, 387(1951) ("That the power to make an arrest is not per se, abstractly speaking, an exclusive function of the executive department of the government is made manifest by the provisions of section 837 of the Penal Code which authorizes arrests by private persons."). The term "public offense" in Section 837 includes misdemeanors. People v. Campbell, 27 Cal. App. 3d 849, 854 (Ct. App. 1972). This authority is circumscribed:

> The authority of a private citizen to make an arrest is more limited than that of a peace officer. A peace officer may arrest a person without a warrant whenever he has probable cause to believe that the person has committed a misdemeanor in his presence. . . . A private citizen, however, may arrest another for a misdemeanor only when the offense has actually been committed or attempted in his presence. . . . The mere fact that the private person has reasonable cause to believe a misdemeanor offense has been committed or attempted in his presence is not enough.

Hamburg v. Wal-Mart Stores, Inc., 116 Cal. App. 4th 497, 512 (2004), as modified (Mar. 3, 2004) (internal citations and quotations omitted). When acting pursuant to the circumstances described in Section 837, "private citizens are privileged to deprive others of their freedom" without committing the tort (and crime) of false imprisonment. People v. Cheatham, 263 Cal. App. 2d 458, 462 (Ct. App. 1968).

City Defendants argue that Officer Stoll "witnessed Young commit or attempt to commit two public offenses in his presence: hit-and-run (Cal. Veh. Code § 20002) and vandalism (Cal. Penal Code § 594)," affording him lawful privilege to detain Plaintiff on that basis. (City MSJ at 14.) The Court evaluates each contention in turn.

Section 20002 provides, "[t]he driver of any vehicle involved in an accident resulting only in damage to any property, including vehicles, shall immediately stop the vehicle at the nearest location that will not impede traffic or otherwise jeopardize the safety of other motorists." Cal. Veh. Code § 20002(a). A driver "shall also immediately do either of the following": (1) "locate and notify the owner or person in charge of that property of the name and address of the driver and owner of the vehicle involved and, upon locating the driver of any other vehicle involved or the owner or person in charge of any damaged property, upon being requested, present his or her driver's license, and vehicle registration, to the other driver, property owner, or person in charge of that property," or other actions based on circumstances not at issue here (e.g., provide written notice to the owner of an unattended vehicle). Id. § 20002(b). "The essential elements of a violation of section 20002, subdivision (a) are that the defendant: (1) knew he or she was involved in an accident; (2) knew damage resulted from the

accident; and (3) knowingly and willfully left the scene of the accident (4) without giving the
required information to the other driver(s)." People v. Carbajal, 10 Cal. 4th 1114, 1123 n.10
(1995). "The duties imposed by law upon the driver of a vehicle involved in an accident resulting
in damage to property are not affected by the cause of or the blame for the accident. . . If such a
driver willfully fails to perform any of the duties imposed upon him/her, he/she is guilty of a
misdemeanor, whether the accident was caused by his/her own or another's negligence, or by the
concurrent negligence of two or more persons, or was unavoidable." Id. (citation omitted).
"Neither knowledge of injury nor knowledge of the seriousness of the nature of the accident is
required for a conviction under Vehicle Code section 20002, which provides that a driver of a
vehicle in an accident resulting in damage to property commits a misdemeanor if he fails to stop
and give the required information." People v. Holford, 63 Cal. 2d 74, 80 n.3 (1965). Under
California law, "'Willfully'" means "a purpose or willingness to commit the act.'" Cal. Penal
Code §(7)(1).

City Defendants impliedly concede that Officer Stoll believed Plaintiff committed or
attempted to commit "misdemeanor" hit and run. (See City MSJ at 14.) Under that scenario,
Mr. Young must actually have committed the offense or attempted it in his presence, while the
mere fact that Officer Stoll might have had reasonable cause to believe that the offense was
committed would not be enough. See Hamburg, 116 Cal. App. 4th at 512; Cal. Penal Code § 837.
City Defendants claim that Plaintiff attempted to commit hit and run because (1) he struck
Officer Stoll's vehicle; (2) he caused damage to the vehicle; (3) Plaintiff exited his vehicle and
inspected the rear of Officer Stoll's vehicle, from which he gathered that the collision had
damaged Officer Stoll's car; (4) Plaintiff saw Officer Stoll standing in front of Officer Stoll's
vehicle; (5) Plaintiff did not immediately walk over to the front of Officer Stoll's vehicle where
Officer Stoll was standing; and (6) Plaintiff began walking toward the entrance of his residence
carrying fast food. (See City MSJ at 14.) Plaintiff explicitly concedes that he knew that he was
involved in an accident, and all but concedes that he knew that it caused damage. (See
Opposition to City MSJ at 6.) Plaintiff disputes that he "knowingly and willfully left the scene of
the accident . . . without giving the required information to the other driver," Carbajal, 10 Cal.
4th at 1123 n.10, because he contends that he never left the scene of the accident, nor did he
intend to. (See Opposition to County MSJ at 7-8.)

The parties do not cite any cases defining the meaning of a "scene" within the meaning
of Section 20002, nor was the Court able to find any authorities that are on point. As such, it is
somewhat ambiguous what the "scene" here should encompass: the area immediately
surrounding the two vehicles? The area from the vehicles to the gate to Plaintiff's property?
Plaintiff's driveway? The area from the two vehicles all the way to Plaintiff's front door? In light
of that ambiguity, the Court cannot say that any reasonable jury would define the "scene" as
narrowly as City Defendants appear to, which is more or less the area surrounding the two
vehicles. Applying a broader understanding of the "scene," a reasonable jury could very well
think that Plaintiff never left the "scene," nor intended to leave the "scene," as long as he stayed
within an area in between the vehicles and his front door, and intended to do so. (A reasonable
jury is unlikely to find that the "scene" encompasses the inside of Plaintiff's home: indeed, if
Plaintiff was involved in a collision and attempted to run inside his own home without contacting

Officer Stoll, that would almost certainly be a straightforward case of hit-and-run.) A reasonable jury could also accept Plaintiff's explanation for his own actions. In his narrative, Plaintiff was carrying food for his daughter, while Officer Stoll was on the phone. Seeing his neighbor, Ms. Lewis, was steps away, he only walked away from the two vehicles to give her the food, so she could in turn give the food to his daughter. His plan was not to run away: he just wanted to give his daughter the food before talking to Officer Stoll about the collision. After retrieving the food, he only made it four or five steps, and never made it to his own gate. At that point, Officer Stoll yelled at him to "drop it." Plaintiff explained to Officer Stoll that the food was for his disabled daughter. Complying with Officer Stoll's order to "drop" the food, he put it on the hood of his vehicle, whereafter Officer Stoll grabbed his arm. (See City MSJ GDMF ¶¶ 46-49, 51, 73; City SUF ¶¶ 13-18.) Viewed in the light most favorable to Plaintiff, a reasonable jury could assess this evidence and conclude that Plaintiff did not knowingly and willfully leave the scene of an accident without giving the required information to Officer Stoll. Other, weaker evidence may also support Plaintiff's case: while it is certainly not dispositive of the issue, a jury could be persuaded further by the fact that Plaintiff was never cited or charged with a violation of Section 20002, nor did Officer Stoll report to Deputy Remington that Plaintiff had committed or attempted to commit a hit-and-run. (See City MSJ GDMF ¶¶ 54-55.)

The Court also finds summary judgment unwarranted on the grounds that Plaintiff committed vandalism or that Officer Stoll had sufficient cause to believe he did. In California, "[e]very person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than those specified by state law, is guilty of vandalism: (1) Defaces with graffiti or other inscribed material. (2) Damages. (3) Destroys." Cal. Penal Code § 594(a)(1). Vandalism causing damage in excess of $400 may be charged as a felony. Id. § (b)(1). "'Maliciously" means a wish to 'vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.'" Cal. Penal Code § 7(4). That definition is applicable to Section 594. See People v. Campbell, 23 Cal. App. 4th 1488, 1493 (1994). Malice "calls for more than mere intentional harm without justification or excuse; there must be a wanton and wilful (or 'reckless') disregard of the plain dangers of harm, without justification, excuse or mitigation." Id. (citation omitted).

As noted above, the Court finds no dispute as to the fact that Plaintiff caused more than $400 of damage to Officer Stoll's vehicle. The only genuine dispute is whether he acted with malice. City Defendants argue as follows:

> There are only two plausible explanations for Young's conduct,
> and either one confirms that he committed felony vandalism when
> he struck Stoll's vehicle. The first is that Young, incensed by his
> daughter's panic at the arrival of law enforcement, intended to
> strike and cause damage to Stoll's vehicle. The second is that
> Young, incensed by his daughter's panic at the arrival of law
> enforcement, intended to approach Stoll's vehicle at a high rate of
> speed and stop quickly next to it in order to intimidate

> Stoll, who was standing nearby. Regardless, Young's conduct was
> willful and wanton, with a general intent to cause harm, such that
> he satisfies the intent requirement for malicious damage to
> property.

(City MSJ at 16.) These interpretations of Plaintiff's possible state of mind may or may not be accurate, but the Court cannot hold that they are the only conclusions that could be reached by a reasonable jury. Indeed, City Defendants' argument essentially asks the Court to resolve some factual disputes in their favor, which the Court cannot do. There is a genuine dispute of material fact as to whether and at what point Plaintiff saw Officer Stoll's vehicle before hitting it and whether he applied his brakes before the collision. Plaintiff contends (at least since this lawsuit was filed) that his vision was obstructed by Ms. Lewis's Suburban, which meant that he was not able to see Officer Stoll's vehicle until the last second. Once he was mere feet away, he attempted to apply the brakes, but it was too late, especially because his tires had low tread. He has consistently maintained that the collision was an accident. City Defendants claim that Plaintiff intentionally rammed Officer Stoll's vehicle. They assert that Plaintiff did not apply the brakes, his claimed inability to have seen Officer Stoll's car is incredible, and hitting the vehicle at a relatively high rate of speed is inconsistent with accidental conduct. (See County SUF ¶ 18; County MSJ GDMF ¶ 18; Response to County MSJ GDMF ¶ 73; City SUF ¶ 12.) In the Court's view, the video evidence is not conclusive: a reasonable jury could find that it supports either side. Based on the visual and physical evidence, it is not overwhelmingly obvious that Plaintiff intended to collide with Officer Stoll's car. As to City Defendants' arguments regarding Plaintiff's possible motives for an intentional collision, they are essentially conjecture. The sole direct evidence of Plaintiff's state of mind is Mr. Young's own statements, which have been consistent in at a fundamental regard: he maintains that it was an accident. Moreover, much of the evidence City Defendants cite, and which could have formed the basis of a decision to arrest by Deputy Remington and the County based upon an investigation, was discovered after the initial altercation with Officer Stoll. In other words, even if Deputy Remington could have studied the road for evidence of braking and found none, strengthening a probable cause determination as to a vandalism charge, Officer Stoll had no such luxury at the time he detained Plaintiff. At that point, all that Officer Stoll knew was basically that a man had just hit his car. It was a significant leap of logic to immediately conclude that that man had hit his car with malice, as opposed to negligently or accidentally. Based on these disputed facts, a reasonable jury might not make that leap with Officer Stoll, resolving the issue in Plaintiff's favor.

Because a reasonable jury could find that Officer Stoll did not have lawful privilege to detain Plaintiff, the Court DENIES the City MSJ as to Plaintiff's seventh cause of action.

## I.   Ninth Cause of Action: Negligence Against the City and Officer Stoll

City Defendants move for summary judgment on Plaintiff's negligence claim on the grounds that Plaintiff cannot assert two theories of liability against Officer Stoll and the City: (1) Officer Stoll provided reasonable medical care to Plaintiff; and (2) the City exercised due care in hiring, training and retaining Officer Stoll. (See City MSJ at 16-21.) The Court holds that a

reasonable jury could find that Officer Stoll breached a duty to provide reasonable medical care to Plaintiff and that the City could be liable for inadequately supervising, training and retaining Officer Stoll prior to his allegedly tortious conduct, although there is no basis for a negligent hiring claim.

Somewhat curiously, although City Defendants argued that Officer Stoll acted under his authority as a private citizen to arrest or detain Plaintiff, they argue that an "arresting officer" has a duty to exercise due care in providing or obtaining medical care to an arrestee, while claiming that Officer Stoll did not breach that duty. (See id. at 16-17.) The Court is not entirely persuaded that Mr. Still can simultaneously affirm and disclaim the authority of an officer, but since Plaintiff proceeds on that understanding as well, the Court will evaluate Officer Stoll's duties to Plaintiff on the assumption that he was an officer who had just detained or arrested Mr. Young. (See Opposition to City MSJ at 10-11.)

Two authorities are particularly instructive as to the duty an officer owes a civilian in his care prior to incarceration, i.e., following a mere arrest. In Winger v. City of Garden Grove, 806 F. App'x 544 (9th Cir. 2020), the Ninth Circuit faced the "initial issue [of] . . . whether, under California law, a law enforcement officer owes a duty of reasonable care to an arrestee in his custody who needs immediate medical attention." Id. at 545. The Ninth Circuit, acknowledging that "no California Court has squarely decided the issue presented by this case," noted that the California Supreme Court has "stated that a law enforcement officer has a duty of care when his conduct, 'in a situation of dependency, results in detrimental reliance on him for protection.'" Id. (quoting Williams v. State of California, 34 Cal. 3d 18, 25 (1983)). Additionally, in Giraldo v. Dep't of Corr. & Rehab., 168 Cal. App. 4th 231, 250 (2008), a California appellate court found that a jailer owes a duty of due care to a prisoner who needs immediate medical attention. Id. at 546. "The reasoning employed by the court in Giraldo" and other "general principles" persuaded the panel that "the California Supreme Court would hold that a law enforcement officer owes a duty of care to an arrestee in his custody who needs immediate medical care." Id. Thus, under the circumstances at issue in Winger, the panel found that a reasonable jury could find that officers breached a duty of due care to an arrestee who may have needed immediate care when they instead took her to jail instead of to a hospital. See id. at 546. The arrestee was apparently unable to spell her first name, recall her last name, or provide coherent answers to basic questions; she said had recently spent time in a hospital; and otherwise evinced potential symptoms of a stroke, on which the officers had received training. See id. at 547.

Months later, the First District Court of Appeal, relying in part on Winger, held that there is a special relationship between an arresting officer and an arrestee that gives rise to a duty of reasonable care. Frausto v. Dep't of Cal. Highway Patrol, 53 Cal. App. 5th 973, 993 (2020). The facts giving rise to that duty of due care were extreme: officers observed a driver place something in his mouth and begin chewing during a traffic stop; officers arrested him, concluding that he had ingested a plastic baggie of a controlled substance; after they brought him to jail for booking, they did not disclose to jail personnel that he likely had ingested a controlled substance; and shortly thereafter the arrestee collapsed and began foaming at the mouth, leading to his death, for which a coroner's report confirmed that he had died due to acute methamphetamine

toxicity.  See id. at 978-988.  The court held that "[w]hether the officers should have recognized a need for immediate medical attention despite the absence of symptoms of drug use and Cornejo's disclaimers and rejection of offers of medical assistance was a question of fact, as was the question whether the duty of care was satisfied by taking Cornejo to jail rather than the hospital.  These were questions for the jury, not legal questions delineating the scope of the duty."  Id. at 993.

     After conceding that Officer Stoll owed a duty of duty care to Plaintiff after their altercation and Mr. Young's detention, City Defendants argue in rather conclusory fashion that Officer Stoll "satisfied any duty of due care resulting from his brief detention of Young pending Deputy Remington's arrival."  (City MSJ at 17.)  In their view, in the roughly 10-minute period prior to Deputy Remington's arrival, Officer Stoll provided Mr. Young with two bottles of water, which was sufficient to address the pepper spray residue on Mr. Young's face and body.  There were no other indications of any serious injury to Mr. Young or signs that he required medical attention.  (See id.)  The Court cannot agree with City Defendants as a legal or factual matter. To begin, unlike every other Defendant, Officer Stoll undoubtedly caused Plaintiff's physical injuries, in a manner that City Defendants all but concede a jury could find to be unreasonable by declining to move for summary judgment on the majority of the claims asserted against Officer Stoll.  Whatever may be said of the duty of other Defendants who did not cause Plaintiff's physical harm in the first place, Officer Stoll surely had a heightened duty of due care when he was the one who caused Mr. Young to suffer that harm.  See M.B. v. City of San Diego, 233 Cal. App. 3d 699, 704 (Ct. App. 1991) (explaining that the police generally owe no duty of due care to civilians to protect them from harm from third parties, but a "special relationship between the police and an individual has been found in a few narrow circumstances where the police made specific promises to undertake a particular action and failed to do so, . . . where the police created or increased a peril by affirmative acts, . . . or where the police voluntarily undertook to aid an individual, took affirmative steps to aid the individual and by the acts lulled the individual into a false sense of security" (citations omitted); Williams, 34 Cal. 3d at 23 ("As a rule, one has no duty to come to the aid of another.  A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act"); Frausto, 53 Cal. App. 5th at 990 ("The most important of [the] considerations in establishing duty is foreseeability.  As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'") (citation omitted).  While the parties cite no case directly on point, it is not hard to reason that an officer who causes an injury to a civilian, potentially without any provocation (as noted above, it is disputed whether Plaintiff actually hit Officer Stoll before Officer Stoll hit and pepper sprayed Mr. Young), owes a duty of due care that equals or exceeds that of an officer who knows of an arrestee's need for immediate medical care that was caused by a third party.  If it resolves factual disputes in Plaintiff's favor, a reasonable jury could conclude that Officer Stoll breached that duty of due care in the roughly 10-minute period prior to Deputy Remington's arrival.  It is disputed whether Officer Stoll gave Plaintiff one or two water bottles, but it is generally undisputed that Officer Stoll did so by dropping it or them in Plaintiff's lap.  Thereafter, he told Plaintiff to pour the water onto his face and turn toward the wind.  After giving Plaintiff the

water, Officer Stoll simply returned to his vehicle, without making any effort to determine whether Plaintiff was injured from his use of force. Further, it is undisputed that Officer Stoll was familiar with the debilitating effects of pepper spray. (See City SUF ¶¶ 19, 25; City MSJ GDMF ¶¶ 83-85, 87.) A reasonable jury could find that, by hitting and pepper spraying Plaintiff, dropping a water bottle or two in his lap, and then returning to his vehicle, all without checking whether Mr. Young was injured, Officer Stoll breached a duty of due care, causing harm to Plaintiff. As such, City Defendants are not entitled to summary judgment as to Plaintiff's negligence claim for failure to provide adequate medical care against Officer Stoll, or the City, which is vicariously liable for Officer Stoll's actions.

Plaintiff also asserts that the City was negligent in its hiring, retention, supervision and training of Officer Stoll. (See TAC ¶ 127.) The Court finds that Plaintiff's negligent hiring claim cannot survive summary judgment but that he has supplied sufficient evidence for a reasonable jury to find that the City was negligent in its conduct after hiring.

With regard to Plaintiff's negligent hiring claim, "[a]n employer may be liable to a third person for the employer's negligence in hiring . . . an employee who is incompetent or unfit." Roman Cath. Bishop v. Superior Ct., 42 Cal. App. 4th 1556, 1564 (1996). "Liability for negligent hiring . . . is based upon the reasoning that if an enterprise hires individuals with characteristics which might pose a danger to [others], the enterprise should bear the loss caused by the wrongdoing of its incompetent or unfit employees." Mendoza v. City of Los Angeles, 66 Cal. App. 4th 1333, 1339 (1998). "Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." Doe v. Cap. Cities, 50 Cal. App. 4th 1038, 1054 (1996). The central question in a negligent hiring action is whether the employer had prior knowledge that the person they hired had a propensity to commit the harm which he ultimately committed:

> The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work . . . entrusted to him. . . . An agent, although otherwise competent, may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . . . If . . . the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm. . . .

Evan F. v. Hughson United Methodist Church, 8 Cal. App. 4th 828, 836 (1992) (quoting Rest. 2d Agency, § 213, Comment d).

The Court finds it undisputed that, pursuant to City policy, the Code Enforcement Division performed a background check on Officer Stoll prior to his hiring which included contacting Officer Stoll's prior employers and LiveScan fingerprinting.  (City SUF ¶ 33.)  It is also undisputed that the background check revealed no issues of concern.  (Id. ¶ 34.)  Plaintiff has failed to adduce any evidence that would suggest that City Defendants had any reason to know of Officer Stoll's propensity for violence prior to hiring him.  That Officer Stoll may have ended up assaulting Plaintiff without justification does not, by itself, mean that such harms were foreseeable at the time of hiring.

Although it is a close call, the Court finds that a reasonable jury could conclude that the City was negligent in supervising, retaining, or training Officer Stoll, such that it could have discovered potential misconduct he committed prior to the incident at issue here and intervened appropriately, either by providing him with additional training, discipling him, or terminating his employment.  A negligent supervision claim is similar to a negligent hiring claim except with regard to the time period at issue, and "depends, in part, on a showing that the risk of harm was reasonably foreseeable."  D.Z. v. L.A. Unified Sch. Dist., 35 Cal. App. 5th 210, 229 (2019).  "Foreseeability is determined in light of all the circumstances and does not require prior identical events or injuries."  M. W. v. Panama Buena Vista Union Sch. Dist., 110 Cal. App. 4th 508, 519 (2003).  "[N]egligence is established if a reasonably prudent person would foresee that injuries of the same general type would be likely to happen in the absence of adequate safeguards."  D.Z., 35 Cal. App. 4th at 229 (internal quotations, brackets and citations omitted).  While the Court can discern no basis that the City knew or should have known about Officer Stoll's potential to have negative interactions with citizens prior to hiring him, there are multiple undisputed and disputed facts (the latter of which could be resolved in Plaintiff's favor) that could lead a reasonable jury to conclude that the City should have known Officer Stoll presented a risk prior to this incident.  While there do not appear to be any prior incidents of violent outbursts by Officer Stoll prior to the incident giving rise to this case, one of Officer Stoll's co-workers did testify that she had overheard Officer Stoll talking in the office about "detaining" civilians prior to this incident, which Officer Stoll indisputably lacked the authority to do as a Code Enforcement Officer.  (City MSJ GDMF ¶ 134.)  There is least a weak inference of the potential for inappropriately aggressive behavior from the fact that Officer Stoll was not supposed to be wearing a tactical vest while performing his duties, but he did— a fact that seemingly would have been obvious to his colleagues and superiors.  (Id. ¶ 132.)  Of even greater concern, the way that an employer would generally understand whether its employee is performing satisfactorily and address any deficiencies is by conducting performance evaluations.  But it is undisputed that the City was supposed to evaluate Officer Stoll on an annual basis, while he only received one performance evaluation by the City during his tenure.  (Id. ¶ 137.)  Further, as of October 2016, the City had no processes in place to review altercations between code enforcement officers and civilians, which suggests that it did not require officers to self-report incidents like that at issue here, or implement another means of discovering potential misconduct.  (Id. ¶ 145.)  There is another inference a jury could draw against the City from its actions handling the incident in question: while it was inarguably serious, it is undisputed that the City took no action to investigate Officer Stoll's actions and took Officer Stoll's claim that it was a simple "rear end accident" at face value.  (Id. ¶¶ 138-140.)  Only later, after Officer Stoll engaged in an angry, unprofessional

outburst against his co-worker, Ms. Burks, was Officer Stoll terminated.  At that point, the City seemed to learn more about the incident at issue here and realized that Officer Stoll may have caused harm to others in prior incidents.  (See id. ¶¶ 132, 135-36.)

   While the training provided to code enforcement officers working for the City appeared to be complaint with prevailing practices set forth by CACEO, there is insufficient evidence in the record to definitively show that Officer Stoll was sufficiently trained in regard to at least two issues.  First, while it is undisputed that Officer Stoll lacked the authority to use force against a civilian, he testified that he believed he had that authority, a belief that may have persisted from his prior employment as a sheriff's deputy.  Although the issue is significant, it is unclear to what extent the City's training provided by CACEO clearly instructed officers like Officer Stoll that it was unlawful for them to detain suspects or use any force against them.  (See City MSJ GDMF ¶¶ 118-119, 131.)  Moreover, it is undisputed that the City provided no training of its own, which could have supplemented the training provided by CACEO.  (Id. ¶ 127.)  Second, while the evidence in the record suggests that Officer Stoll and others received adequate training on a host of issues, there is no evidence that Officer Stoll received any training with regard to critical law enforcement techniques that could have potentially prevented the harm caused to Plaintiff.  Most notably, there is no evidence in the record that Officer Stoll was trained in de-escalation techniques or safely responding to situations in which an individual may have attempted to flee, as Officer Stoll asserts he believed Plaintiff did following the collision.  In such a situation, the obvious solution for a City Code Enforcement Officer who lacks the legal authority to detain a suspect or use force would be to call a sheriff's deputy who could intervene.  But in October 2016, the City did not have any policies or procedures for communicating with the County of Riverside Sheriff's Department.  (City MSJ GDMF ¶ 92.)  Taking this evidence together, a reasonable jury could find that the City was negligent in its supervision, retention and training of Officer Stoll, which caused Plaintiff to suffer preventable harm.

   For these reasons, the Court DENIES the City MSJ as to Plaintiff's claim for negligence against Officer Stoll and the City under a theory of vicarious liability.  The Court GRANTS the City MSJ as to Plaintiff's claim for negligent hiring against the City.  The Court DENIES the City MSJ as to Plaintiff's claim for negligent supervision, retention and training against the City.

**C.  Remaining Claims**

   In light of the above holdings and City Defendants' decision not to move for summary judgment on all claims against them, the following claims remain in the TAC that Plaintiff may pursue at trial: (1) violation of 42 U.S.C. § 1983 (excessive force) against Officer Stoll; (3) violation of 42 U.S.C. § 1983 (denial of medical care) against Officer Stoll; (5) assault against Officer Stoll; (6) battery against Officer Stoll; (7) false arrest and false imprisonment against Officer Stoll and the City; (8) intentional infliction of emotional distress against Officer Stoll and the City; (9) negligence against Officer Stoll and the City; and (10) violation of Cal. Civ. Code § 52.1 ("Bane Act") against Officer Stoll and the City.

The final pretrial conference remains set for October 23, 2023, and the jury trial for November 7, 2023.  (Dkt. No. 125.)

## V.    CONCLUSION

For the reasons above, the Court **GRANTS** the County MSJ and **GRANTS-IN-PART** and **DENIES-IN-PART** the City MSJ.  Summary judgment is **GRANTED** in County Defendants' favor on all claims.  Plaintiff's claim for negligent hiring against the City is **DISMISSED**; the City MSJ is **DENIED** in all other respects.  The Court **REAFFIRMS** its earlier dismissal of Plaintiff's Section 1983 cause of action against the City for excessive force and Section 1985(3) claim against Officer Stoll and **DISMISSES** them from the TAC.  The September 18, 2023 hearing on the Motions is **VACATED**.

**IT IS SO ORDERED.**